Hyde *v.* Tanner.

*Mr. Lee,* for the plaintiff.

*A. Lockwood & W. Reynolds,* for the defendants, objected that the notice was of a motion for the *settlement,* and not for the *award,* of issues required by §§ 2 and 3 of the act of May 2, 1839, to amend the act to regulate the trial by jury and the taking of testimony in chancery. (*Laws of* 1839, *p.* 292.) That the notice presupposed an award of issues under the 2d and 3d sections of the act; and that the application was under the 4th section. And they insisted that the court could not *award* issues, upon a notice in this form.

Barbour.
1    75
74h 278
1    75
79h 485

DUTCHESS SPECIAL TERM, September, 1847.
*Barculo,* Justice.

HYDE *vs.* TANNER and others.

Under the provisions of the title of the revised statutes respecting the powers and duties of executors and administrators in relation to the sale and disposition of the real estate of their testator or intestate, for the period of three years after the granting of letters testamentary or of administration, the real estate of which the testator

Hyde *v.* Tanner.

or intestate died seised, remains liable to be sold, under an order of the surrogate, for the payment of debts, in case of a deficiency of personal assets.

This liability attaches to lands, not only in the hands of the heirs or devisees, but in the hands of any subsequent purchaser.

It is a kind of statutory lien running with the land, during the three years.

After the expiration of that period, the heirs or devisees become first liable to suit, and the power of the surrogate ceases. The land is discharged from the lien; the heirs or devisees may sell; and a *bona fide* purchaser will take the estate free and discharged from the debts.

The heirs or devisees may sell and convey the real estate of which the testator or intestate died seised, at any time after his death. But if they convey previous to the expiration of three years, the lands pass subject to the power of the surrogate to direct the same to be sold for the payment of debts.

And in case the exercise of that power becomes necessary, by reason of a want of personal assets, the title made under the surrogate's sale will be paramount to all titles made by or through the heirs or devisees; and will convey the estate precisely as it was left by the decedent.

Where an antecedent equity is clearly established in favor of a party seeking relief, and the legal right has been extinguished under circumstances which will authorize an inference of a mistake in fact, a court of equity will presume such mistake, and enforce the claim, to prevent manifest injustice and hardship.

IN EQUITY. ON the 29th of April, 1844, Nicholas Tanner, father of the defendant Joseph D. Tanner, executed a mortgage to the plaintiff for $4500. On the 30th of September, 1845, Nicholas Tanner died intestate, leaving Joseph D. Tanner and Henry Tanner, his sole heirs at law, and being seised of the real estate covered by said mortgage. On the 27th of April, 1846, Henry conveyed his interest to Joseph; the latter assuming the payment of the mortgage. On the 28th of April, 1846, Joseph applied to the plaintiff for a loan of $430, which sum the plaintiff lent him; making, together with the mortgage debt and interest, the sum of $5200; for which Joseph executed a mortgage upon the same premises. On the 29th of April, 1846, the plaintiff cancelled the mortgage given by Nicholas Tanner, without having received payment, except the mortgage given by Joseph. In December, 1846, the creditors of Nicholas Tanner, deceased, requiring payment of their debts, Joseph applied for letters of administration; and such proceedings were had, that on the 5th of January, 1847, letters of administration were granted to Joseph D. Tanner and George Huffart, jun. The

debts against the estate were ascertained to be over $1300, while the assets amounted to but $35. The administrators therefore applied to the surrogate of Dutchess, under the statute, for authority to lease, mortgage, or sell the real estate of the intestate. On the 12th of April, an order was made by the surrogate that the administrators should sell the lands in question.

Under this order the administrators were proceeding to advertise and sell the real estate, when the plaintiff filed his bill in this cause, and restrained them by injunction. The plaintiff now seeks to have the lands sold, and the proceeds applied in payment of his mortgage debt.

The defendant, Shadrach S. Taber, recovered a judgment in the Dutchess common pleas against Joseph D. and Henry Tanner for $105 damages and costs, on the 24th of April, 1846.

*E. M. Swift & H. Swift,* for the plaintiff.

*J. Emott, jun.,* for the defendants Joseph D. Tanner and George Huffart, jun., administrators, and Richard H. Sherman.

*William Eno & C. J. Ruggles,* for the defendant Taber.

BARCULO, J. This case involves the consideration of the following questions: 1. Can the creditors at large, of a deceased intestate, reach the real estate of the debtor after it has been aliened by the heir to a *bona fide* purchaser? 2. Can the mortgagee, after having cancelled the mortgage given by the intestate, and taken a new mortgage from the heir, set up the first mortgage, as against the general creditors?

In considering the first question, it is necessary to assume that the plaintiff is in the situation of a *bona fide* purchaser. He holds a mortgage executed by the heir to secure a loan of $5200, made partly to the heir and partly to the ancestor. His rights, therefore, under the mortgage are, to the extent of the mortgage debt, as valid as if he held by simple deed for valuable consideration. Nor is the evidence sufficient to charge

Hyde *v.* Tanner.

him *with notice* of the outstanding debts against the intestate. The case is free from embarrassment in this respect. The plaintiff occupies the position of a mortgagee in good faith, holding under a mortgage executed by the heir litigating for priority with the creditors of the ancestor.

According to the English rule, when a testator, by his will, charges his debts, or his debts and legacies, upon lands, a *bona fide* purchaser from the devisee or executor takes the lands discharged from the lien. This doctrine is recognized in a number of cases. (*Eland* v. *Eland,* 1 *Beav.* 235. *S. C. on appeal,* 4 *Myl. & Cr.* 420. *Ball* v. *Haines, Id.* 266. *Jones* v. *Price,* 11 *Sim.* 557. 2 *Sim. & Stu.* 206, *n.* 1.) The principle of this rule is that the purchaser is not bound to see to the application of the purchase money. The purchaser having paid his money in good faith, it devolves upon the creditors to see that it is applied in payment of the debts of the testator. By analogy, it would seem that, independent of any statute, the same rule should be applied to an alienation by the heir of an intestate.

But in this state, the whole matter is regulated by statute. The first section of the title of the revised statutes relative to the powers and duties of executors, &c. in relation to the sale and disposition of real estate, (2 *R. S.* 100,) provides that "after the executors or administrators of any deceased person shall have made and filed an inventory according to law, if they discover the personal estate of their testator or intestate to be insufficient to pay his debts, they may, at any time within three years after the granting of their letters testamentary or of administration, apply to the surrogate for authority to mortgage, lease, or sell so much of the real estate of their testator or intestate, as shall be necessary to pay such debts." This statute necessarily implies that the surrogate has power to hear such application and grant the order applied for. It also follows that, if the order is to be effectual, it must be able to reach all the real estate of which the testator or intestate died seised. That such was the intention of the legislature is apparent from the language of the 17th section of the same title; which declares that "a lease or mortgage executed under the authority of the surrogate as afore-

Hyde *v.* Tanner.

said, shall be as valid and effectual, as if executed by the testator or intestate *immediately previous to his death.*" (*Id.* 103.) It needs no argument to show that the effect given to a lease or mortgage, in this section, is inconsistent with the power of the heir or devisee to alien and convey an unincumbered title within three years after the granting of letters testamentary or of administration.

Again; the 18th section provides that if the moneys required cannot be raised by lease or mortgage, the surrogate shall order " a sale of so much of the real estate *whereof the testator or intestate died seised,* as shall be sufficient to pay the debts," &c. This section clearly gives the power to sell, in case it is required, all the real estate owned by the debtor *at the time of his death,* without regard to any subsequent conveyances. The only restriction upon this authority is contained in the 20th section, by which it appears, that if any of the lands so left " have been sold by the heirs or devisees, then the lands remaining in their hands unsold, shall be ordered to be *first sold :*" implying that in case the proceeds of those lands should be insufficient, then the order of the surrogate shall direct the lands aliened by the heirs or devisees to be *secondly sold.*

It may be well, in this connexion, to refer to the statutory remedy given to creditors against heirs and devisees. The 53d section of the same title enacts that " no suit shall be brought against the heirs or devisees of any real estate, in order to charge them with the debts of the testator or intestate, within three years from the time of granting letters testamentary or of administration upon the estate of their testator or intestate; and if after the expiration of that time, such suit shall be brought, upon proof of an application having been made, before the expiration of that period, for an order of sale pursuant to the provisions of this title, such suit shall be stayed by the court in which it shall be pending, until the result of such application." (2 *R. S.* 106.)

The several provisions of the statute are entirely consistent with each other. They admit of but one construction. For the period of three years after the granting of letters testamen-

tary or of administration, the real estate of which the testator or intestate died seised, remains liable to be sold under an order of the surrogate for the payment of debts, in case of a deficiency of personal assets. This liability attaches to the lands, not only in the hands of the heirs or devisees, but in the hands of any subsequent purchaser. It is a kind of statutory lien running with the land, during the three years. After the expiration of that period, the heirs or devisees become first liable to suit; and the power of the surrogate ceases. The land is discharged from the lien; the heirs or devisees may sell; and a *bona fide* purchaser takes the estate free and discharged from the debts. (2 *R. S.* 455, §§ 51, 61.)

It is not intended to be said that the heirs or devisees may not alien prior to the expiration of the three years. They may sell and convey at any time after the death of the testator or intestate. But if they convey before the expiration of that period, the lands pass subject to the power of the surrogate to direct the same to be sold for the payment of debts. And in case the exercise of that power becomes necessary, by reason of a want of personal assets, the title made under the surrogate's sale will be paramount to all titles made by or through the heirs or devisees, and will convey the estate precisely as it was left by the decedent.

Applying these views of the law to the case under consideration, the plaintiff must fail in his attempt to establish the mortgage of Joseph D. Tanner as a lien upon the real estate of Nicholas Tanner, prior to the claims of the creditors of the latter.

The second question to be examined is, whether the facts of the pre-existence of the debt of $4500, and of the mortgage given by the intestate, together with the circumstances of the cancellation of that mortgage and the execution of a new one by Joseph D. Tanner, do not authorize and require this court to set up the old mortgage, or prefer the plaintiff's claim for the amount secured by that, to the claims of the general creditors of the deceased.

In the first place, it is to be remarked that neither of the an-

tagonistic claimants has a *legal lien* upon the premises. It is a question of equitable liens. If the court is satisfied that the plaintiff has the superior equity, it has the power to give him a preference over the claims of the creditors. The only ground upon which the plaintiff can ask relief, on this point, is, that the first mortgage was cancelled through mistake, such as a court of equity will rectify.

There is indeed a strong presumption, arising from the circumstances attending that transaction, that the plaintiff acted under a mistaken view of his rights. For no reasonable man, who fully understood the effect of his acts, would accept the mortgage of the heir in lieu of that of the ancestor, while the estate of the latter remained unsettled, and liable to a large amount of debts. But whether the plaintiff was mistaken as to the *fact* of the existence of these debts over and above the amount of the personal assets, or whether he was merely mistaken as to the legal effect of the new mortgage, does not so clearly appear. If it was a mistake of the *fact*, then a court of equity, according to established principles, will relieve against it. If it was a mistake of *law* only, no relief can be given. (*Story's Com. on Eq.* § 110 *to* 183.) Judge Story thus lays down the law; although it must be conceded that the English decisions are by no means uniform on the subject. There are several cases reported in which the courts have granted relief against what appeared to be a mere ignorance of the law. In the case also of *Hunt* v. *Rousmanier*, (8 *Wheat. Rep.* 174,) Chief Justice Marshall, in delivering the opinion of the court, says : "Although we do not find the naked principle that relief may be granted on account of ignorance of law, asserted in the books, we find no case in which it has been decided that a plain and acknowledged mistake in law is beyond the reach of equity." In that case, Hunt deliberately took a power of attorney with authority to sell the property, instead of a mortgage, to secure the payment of a loan of money ; upon the mistake of law, that the security by the former instrument would bind the property equally as strong as a mortgage. But the debtor, Rousmanier, dying, the power of attorney became revoked and

ineffectual as a security.   Hunt then brought his bill in equity against the administrators of Rousmanier, to reform the instrument, or to give it· a priority by way of lien on the property. The defendants demurred to the bill, and the circuit court of Rhode Island sustained the demurrer, and dismissed the bill. On appeal, the supreme court of the United States reversed the decision.   The opinion in that case concludes as follows : " We find no case which we think precisely in point ; and are unwilling, where the effect of the instrument is acknowledged to have been entirely misunderstood by both parties, to say that a court of equity is incapable of affording relief."

The defendant's counsel cited the recent case of *Banta* v. *Garmo*, (1 *Sand. Ch. Rep.* 383.)   In that case, Garmo had, in 1831, executed a mortgage to the county clerk for $2100.   On the 25th of July, 1838, he borrowed $2200 of Banta, paid up the old mortgage and had a satisfaction piece executed, and gave Banta a new mortgage upon the same premises.   In 1837, a judgment was recovered against Garmo, and the lands were sold by execution thereon in February, 1838.   Banta claimed the right to set up the mortgage to the county clerk, and to be subrogated to the same, as against the intervening judgment.   The assistant vice chancellor denied the relief. That case differs essentially from the present, in this respect : There the first mortgage was delivered up by a stranger : here the first security was given up by the party who seeks to set it up again.   The assistant vice chancellor adverts to the distinction when he says : " The adjudged cases relied upon, where parties were allowed to have relief upon instruments delivered up in ignorance of facts, were all cases in which the right was revived in behalf of the parties who had delivered up those instruments under such mistake."   If in that case Banta had held the oldest mortgage, and had cancelled it under a misapprehension of facts, so as to let in the judgment, it is very possible the decision would have been different.

A similar decision was made in the case of *Garwood* v. *Admr's of Eldridge*, (1 *Green's Ch. Rep.* 145.)   That was a case in which Garwood, having purchased real estate subject

Hyde *v.* Tanner.

to two mortgages and a judgment, applied the whole of the purchase money to the payment of the mortgages, and caused them to be cancelled of record. The property was then sold under the judgment, which was younger than the mortgages. Garwood then filed his bill for relief against the judgment and sale under it; setting forth that he was ignorant of the existence of the judgment, and claiming the interposition of the court, upon the ground of a mistake of facts, and upon the ground that a court of equity should revive the mortgages for his benefit. The chancellor of New Jersey denied the prayer of the bill, for the reason that the mistake, if any, was merely of law ; and that the cases in which the court keep alive a discharged mortgage, are those where the mortgage is discharged by a third person, and not where it is taken up by the obligor himself.

The rule was certainly applied in that case more rigidly than is usually done in the English courts. Indeed, it is difficult to discover how the question turned upon a mistake *in law*. It could hardly be pretended that Garwood was ignorant of the legal effect of cancelling the mortgages. It is evident that the mistake was one *of fact ;* that he was ignorant of the existence of the judgment. If so, he was entitled to relief, according to the English decisions.

Thus in *Pusey* v. *Desbouvrie,* (3 *P. Wms.* 315,) Lord Chancellor Talbot set aside a release of her orphanage share executed by a daughter of a freeman of London. Her father had left her a legacy of £10,000 : and she was informed by her brother that she was entitled to her election ; to take an account of her father's personal estate and claim her orphanage share, or to take the legacy. She chose the latter. Relief was granted : the court *presuming* that she was ignorant of the fact that she had a right to have the account taken, and the amount of her orphanage part ascertained, before she made her election.

The principle upon which courts of equity proceed cannot, perhaps, be better illustrated, than by a reference to a class of cases in which a joint obligation has been set up against the representatives of a deceased obligor, who were discharged at

law. (*Simpson* v. *Vaughan,* 2 *Atk.* 31.   *Bishop* v. *Church,*
2 *Ves.* 100.   *Underhill* v. *Howard,* 10 *Id.* 209.   *Thomas* v.
*Frazer,* 3 *Id.* 399.   *Hunt* v. *Rousmanier,* 8 *Wheat.* 174.
*Story's Com. on Eq.* § 162, *n.* 1.)   In these cases no mistake
was expressly established.   In the language of Judge Story,
the mistake is "implied from the nature of the transaction."
Lord Eldon says, "the court has inferred, from the nature of
the condition, and the transaction, that it was made joint by
mistake.   That is, the instrument is not what the parties in-
tended in fact.   They intended a joint and several obligation ;
the scrivener has, by mistake, prepared a joint obligation."   It
will be perceived that the mistake is always *inferred.*   No ac-
tual proof is necessary.   All that is required is to establish an
antecedent equity, by showing that the deceased obligor received
a benefit from the obligation.   Thus, if a joint obligation be
given for a loan of money, and one of the obligors die, by which
the legal obligation is discharged, the court will presume a
mistake in drawing the bond, and set it up as a several
bond against the representatives ; provided it appears that
the deceased obligor received a portion of the money, but not
otherwise.

The principle deduced from the numerous authorities on this
subject is this : Where an antecedent equity is clearly estab-
lished in favor of the party seeking relief, and the legal right
has been extinguished under circumstances which will author-
ize an inference of a mistake in fact, a court of equity will pre-
sume such mistake, and enforce the equitable claim, to prevent
manifest injustice and hardship.

Now, in applying this doctrine to the case before us, we find,
in the first place, a strong antecedent equity in favor of the
plaintiff, in the fact that the sum of $4500 was the proper debt
of the intestate, and was secured by his mortgage upon the
premises in question.   That mortgage was cancelled without
payment of the debt, or any other consideration, except the new
bond and mortgage given by the heir.   The circumstances
will authorize the inference that this was done under a mistake
of fact as to the existence or amount of the intestate's debts,

and as to the insufficiency of the personal assets to satisfy them. The plaintiff therefore comes within the rule entitling him to the aid of this court.

The decree which is to be entered must provide for a continuance of the injunction and for the sale of the mortgaged premises, and for the distribution of the proceeds of the sale, as follows : 1. The amount which would have been due on the first mortgage is to be first paid. 2. The amount of debts of the estate of Nicholas Tanner, as ascertained by the surrogate, with interest, is to be next paid. 3. The costs of all the parties must he next paid ; rateably in case of a deficiency. 4. The judgment of Taber is next to be paid. 5. Then an amount is to be applied towards the balance due on the mortgage given by Joseph D. Tanner, sufficient to satisfy the same. 6. The residue, if any, to be paid to Joseph D. Tanner.

---

SAME TERM.   *Before the same Justice.*