**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RODNEY WINFIELD,
Plaintiff-Appellee,

v.

G. L. BASS; KELVIN CARLYLE;
ANTHONY CLATTERBUCK; JAMES
HICKS; GALVIN SIZEMORE; RONALD

No. 94-7346

WILLIAMS, or Walter Williams;
DONALD WILMOUTH, Lieutenant,
Defendants-Appellants,

and

UNKNOWN PRISON GUARDS,
Defendants.

RODNEY WINFIELD,
Plaintiff-Appellee,

v.

G. L. BASS; KELVIN CARLYLE;
ANTHONY CLATTERBUCK; JAMES
HICKS; GALVIN SIZEMORE; RONALD

No. 95-6422

WILLIAMS, or Walter Williams;
DONALD WILMOUTH, Lieutenant,
Defendants-Appellants,

and

UNKNOWN PRISON GUARDS,
Defendants.

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-94-217)

Argued: April 2, 1996

Decided: January 31, 1997

Before WILKINSON, Chief Judge, RUSSELL, WIDENER, HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

_____

Reversed by published opinion. Judge Wilkins wrote the majority opinion, in which Chief Judge Wilkinson and Judges Russell, Widener, Niemeyer, Hamilton, Luttig, Williams, and Motz joined. Chief Judge Wilkinson wrote a concurring opinion, in which Judges Russell, Widener, and Hamilton joined. Judge Motz wrote a concurring opinion. Senior Judge Phillips wrote a dissenting opinion, in which Judges Hall, Murnaghan, Ervin, and Michael joined.

_____

**COUNSEL**

**ARGUED:** Lance Bradford Leggitt, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellants. Sa'ad El-Amin, EL-AMIN & CRAWFORD, P.C., Richmond, Virginia, for Appellee. **ON BRIEF:** James S. Gilmore, III, Attorney General, Pamela A. Sargent, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellants. Beverly D. Crawford, EL-AMIN & CRAWFORD, P.C., Richmond, Virginia, for Appellee.

_____

**OPINION**

WILKINS, Circuit Judge:

Rodney Winfield, an inmate at a Virginia state correctional facility, brought this action pursuant to 42 U.S.C.A. § 1983 (West 1994), alleging that prison officials violated his constitutional rights under

2

the Fifth, Eighth, and Fourteenth Amendments by failing to protect him from another inmate, T. Gibson, who attacked Winfield with a metal shank. Specifically, Winfield claimed that the prison officials exhibited deliberate indifference to his safety by failing to restrain Gibson prior to the attack and by declining to intervene after the attack began. Appellants--Warden G. L. Bass and Correctional Officers Kelvin Carlyle, Anthony Clatterbuck, James Hicks, Galvin Sizemore, Ronald Williams, and Donald Wilmouth--appeal the denial by the district court of their claim that they are entitled to summary judgment on the basis of qualified immunity. Because we conclude that the district court erred in refusing to grant summary judgment in favor of Appellants, we reverse.

I.

The evidence presented by Appellants in support of their motion for summary judgment set forth the following facts. Winfield and Gibson were confined at the Greensville Correctional Center. Late on the evening of February 3, 1993, Winfield, Gibson, and a third inmate were conversing in a cell when a dispute developed between Winfield and Gibson. A scuffle ensued that spilled out of the cell and onto the second-floor tier of the prison. Responding to this disturbance, at least six officers proceeded to the second floor. The fray had ended by the time they arrived, however, because the inmates immediately dispersed when they saw the officers advancing. When the supervising officer, Lt. Hicks, directed that Gibson be removed from the tier, the other prisoners protested, insisting that Gibson had done nothing wrong. Fearing that an attempt to move Gibson under these circumstances might result in a major disturbance, Lt. Hicks ordered all except two of the officers to withdraw from the tier to prevent the confrontation from escalating. Only Officers Williams and Walker remained outside Gibson's cell; neither officer was armed.

At this point, events began to unfold swiftly. Gibson suddenly and without warning emerged from his cell wielding a homemade knife, striking Officer Williams in the face with his fist, knocking him back against the second-tier railing. Gibson then bolted into Winfield's cell three doors away. Officer Walker immediately radioed for assistance. After Officer Clatterbuck, who was now on the first floor, observed Gibson running from his cell, he instantly yelled out a warning that

Gibson had a knife. Officer Clatterbuck and the other correctional officers present then hurried to the nearby control booth to obtain batons and returned to the second tier.

In the meantime, once inside Winfield's cell, Gibson began swinging the shank, striking Winfield. Before the prison staff responded, another inmate, John Scott, entered Winfield's cell and, although stabbed by Gibson, was able to wrestle the shank away from him. The entire incident happened very quickly; only ten seconds were estimated to have elapsed between the assault on Officer Williams and Scott's successful effort to disarm Gibson. Order was restored, and Warden Bass was advised of the disturbance.

In response to the prison officials' motion for summary judgment, Winfield presented his affidavit and documentation from his inmate grievance proceedings. These materials did not take issue with the substance of the factual assertions set forth in the prison officials' affidavits. They, however, did provide three additional allegations concerning these events that had not been included in the officers' submission and that, for purposes of summary judgment, should be taken as true.

First, Winfield asserted that approximately one hour before the attack, Gibson, Winfield, and two other inmates had been drinking homemade wine. Moreover, he maintained that Lt. Sizemore and Officer Clatterbuck observed this behavior during their rounds. Gibson had a brief conversation with these officers at that time and apparently convinced them not to confiscate the wine.

Second, Winfield contended that when the inmates dispersed following his initial altercation with Gibson, he returned to his cell and pressed a buzzer that sent an electronic signal to a central location to indicate that he wished to have the door to his cell closed and locked. Despite several attempts by Winfield to have the door secured, the officers controlling the mechanism did not respond.

Third, and most importantly for our purposes, Winfield claimed that in order to enter the cell to extricate the shank from Gibson, Scott found it necessary to push past two officers who stood looking on throughout the attack. Further, Winfield asserted that neither of the

4

officers attempted to provide assistance to Scott while he struggled with Gibson for the shank.

Based on this record, the district court denied the prison officials' motion for summary judgment. With respect to their claim that there were no genuine issues of material fact necessitating a trial and that they were entitled to judgment as a matter of law, the district court reasoned:

> After reviewing defendants' summary judgment motion and plaintiff's brief and affidavit opposing the motion, the Court finds that there are genuine issues of material fact in this case. Indeed, the Court finds that this case is peculiarly fact-specific and should thus proceed to trial on the merits.

J.A. 80. Turning to Appellants' argument that they were entitled to qualified immunity, the district court opined:

> It is axiomatic that individuals incarcerated in correctional facilities are entitled to be kept secure, and that this right is protected by the Eighth Amendment, the Due Process Clause of the Fifth Amendment, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Moreover, this fundamental right to security certainly was "clearly established" at the time of the assault on plaintiff. Furthermore, where it appears from the factual allegations that prison inmates are allowed liberal access to alcoholic beverages and dangerous weapons, corrections officers are bound to know that the safety of other inmates is at risk. . . . Thus, reasonable people in defendants' position[s] would have known that their permissive attitude[s] toward[ ] spirits and shanks would violate the inmates' right to continued safety and security. Accordingly, the Court rejects defendants' qualified immunity defense.

J.A. 81-82.

The prison officials filed an appeal from the portion of this decision denying their motion for summary judgment based on qualified

5

immunity. In addition, the district court certified for immediate interlocutory appeal the remainder of its summary judgment decision. See 28 U.S.C.A. § 1292(b) (West 1993). And, this court subsequently entered an order permitting the permissive interlocutory appeal.

While the appeals were pending, the Supreme Court decided Johnson v. Jones, 115 S. Ct. 2151 (1995), addressing the jurisdiction of a federal appellate court to entertain an immediate appeal from a refusal of a district court to grant summary judgment based upon qualified immunity. Thereafter, relying on Johnson, a panel of this court issued an opinion concluding that we lacked jurisdiction over the appeal from the decision of the district court denying qualified immunity to Appellants and that permission for the interlocutory appeal of the remainder of the summary judgment order was granted improvidently. Winfield v. Bass, 67 F.3d 529 (4th Cir. 1995). A majority of the court subsequently voted to hear these appeals en banc. Winfield v. Bass, Nos. 94-7346, 95-6422 (4th Cir. Jan. 5, 1996).

We first address our jurisdiction to entertain appeal number 94-7346, which challenges the decision of the district court denying Appellants' claim that they are entitled to qualified immunity. And, concluding that we possess jurisdiction to do so, we turn to consider whether the prison officials were entitled to qualified immunity. Because our determination that the district court erred in refusing to grant summary judgment to Appellants on the basis of qualified immunity is dispositive of the questions presented to us, we need not address appeal number 95-6422.

II.

Federal courts of appeals are granted jurisdiction to hear final decisions of district courts pursuant to 28 U.S.C.A.§ 1291 (West 1993). To the extent that an order of a district court rejecting a governmental official's qualified immunity defense turns on a question of law, it is a final decision within the meaning of § 1291 under the collateral order doctrine recognized in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 (1949), and therefore is subject to immediate appeal. See Behrens v. Pelletier, 116 S. Ct. 834, 836 (1996); Johnson, 115 S. Ct. at 2155-56; Mitchell v. Forsyth , 472 U.S. 511, 524-30 (1985).

6

Prior to the decision of the Supreme Court in Johnson, this court had ruled that it was appropriate for a court of appeals to review a district court order rejecting a defense of qualified immunity on either of two conceptually distinct bases. Turner v. Dammon, 848 F.2d 440, 443-44 (4th Cir. 1988). We permitted officials who were denied summary judgment on the basis of qualified immunity to argue that the district court had erroneously refused to enter judgment in their favor because the evidence presented was insufficient to create a triable issue of fact or because the right that the governmental official had purportedly violated was not clearly established. Id. The Johnson Court, however, rejected our prior practice. See Johnson, 115 S. Ct. at 2154-59. Although the Court reiterated the position that the courts of appeals possess jurisdiction to consider appeals from decisions rejecting a proffered qualified immunity defense to the extent that the district court ruled that the legal right the official purportedly violated was clearly established at the time the action was taken, it held that to the extent that the order of the district court rested upon a determination that the evidence presented was sufficient to raise a genuine issue of material fact necessitating trial, the order is not a final one from which an immediate appeal may be taken. Id.

An articulation of this distinction is rather straightforward, but an application of it may prove to be more difficult. See Woolfolk v. Smith, 81 F.3d 741, 743 (8th Cir. 1996) (per curiam). The Supreme Court directed that in determining our jurisdiction in this area, we should consider the order entered by the district court to assess the basis for its decision. See Johnson, 115 S. Ct. at 2159. As the Court recognized, however, a district court does not invariably provide a clear basis for its decisions or set forth fully the facts on which its resolution is grounded. See id. And, even in those circumstances in which a district court does supply both, difficulty in assessing the threshold jurisdictional issue will remain because the determination of whether the law was clearly established at the requisite level of particularity is an especially fact-bound legal inquiry. See Prosser v. Ross, 70 F.3d 1005, 1006 (8th Cir. 1995); Reece v. Groose, 60 F.3d 487, 490 (8th Cir. 1995). Moreover, all denials of summary judgment, by definition, involve a determination that the evidence is disputed sufficiently to raise a genuine issue of material fact for trial. See Behrens, 116 S. Ct. at 842; Fed. R. Civ. P. 56. And, inherent in every determination that a governmental official is not entitled to qualified immu-

7

nity is the legal determination that viewed in the light most favorable to the nonmoving party, the official's conduct violated a clearly established constitutional or statutory right. See Anderson v. Creighton, 483 U.S. 635, 638-41 (1987). Accordingly, each decision of a district court denying a governmental official's request for summary judgment based upon qualified immunity will encompass a determination that the facts are sufficiently controverted to warrant a trial and that the legal right purportedly violated was clearly established. Obviously, if a determination by a district court that genuine issues of material fact warrant trial were sufficient to prevent us from exercising jurisdiction over an appeal from an order rejecting a qualified immunity defense, we would never have jurisdiction over such appeals--a result plainly at odds with Mitchell and its progeny. See Behrens, 116 S. Ct. at 842.

Consequently, we conclude that we possess jurisdiction to consider an appeal from a decision of a district court rejecting a government official's claim of entitlement to qualified immunity to the extent that the official maintains that the official's conduct did not violate clearly established law. Alternatively, to the extent that the appealing official seeks to argue the insufficiency of the evidence to raise a genuine issue of material fact--for example, that the evidence presented was insufficient to support a conclusion that the official engaged in the particular conduct alleged--we do not possess jurisdiction under § 1291 to consider the claim and, therefore, may not do so absent some independent jurisdictional base. See Johnson, 115 S. Ct. at 2156-58; see also Shinault v. Cleveland County Bd. of County Comm'rs, 82 F.3d 367, 370 (10th Cir. 1996) (recognizing that jurisdiction is controlled by the portion of the order from which appeal is taken and by argument on appeal); Sanders v. Brundage, 60 F.3d 484, 486 (8th Cir. 1995) (explaining that issues raised on appeal control jurisdiction). In other words, we possess no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the events actually occurred, but we have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them.

Here, Appellants did assert in part that the evidence presented by Winfield was insufficient to raise a genuine issue of material fact necessitating a trial (i.e., that the evidence was insufficient to support

8

his factual allegations),**1** and to that extent, we lack jurisdiction pursuant to § 1291 to consider it. Nevertheless, in denying the prison officials' motion for summary judgment, the district court plainly ruled that Winfield's legal right to personal security was clearly established. Moreover, Appellants made clear in supplemental briefing after Johnson was decided, and in oral argument before this en banc court, that they press the legal issue of whether the undisputed facts disclose that reasonable officers would have understood that their conduct violated Winfield's clearly established legal rights. See Miller v. Schoenen, 75 F.3d 1305, 1308-09 (8th Cir. 1996). We therefore possess jurisdiction under § 1291 to consider this latter question and turn now to address it.

III.

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In analyzing an appeal from the rejection of a qualified immunity defense, our first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct, recognizing that the right must be defined at the appropriate level of particularity. Taylor v. Waters, 81 F.3d 429, 433 (4th Cir. 1996). We then consider whether, at the time of the claimed violation, this right was clearly established and "`whether a reasonable person in the official's position would have known that his conduct would violate that right.'" Id. (quoting Gordon v. Kidd, 971 F.2d 1087, 1093 (4th Cir. 1992)).

Although Winfield made general allegations that his rights under the Fifth, Eighth, and Fourteenth Amendments were violated, the gist

---

**1** This is hardly surprising given that the initial briefing was completed before the Supreme Court decided Johnson and that the prior decisions of this court permitted Appellants to raise such a claim. In addition, in this instance an independent jurisdictional basis existed to permit our consideration of the claim because we had granted permission for an interlocutory appeal after the district court entered an order certifying the remainder of the summary judgment order for immediate appeal.

9

of his complaint is that the prison officials were deliberately indifferent to the serious and specific risk of physical harm posed to him by Gibson; thus, the prohibition imposed by the Cruel and Unusual Punishments Clause of the Eighth Amendment and applied to the states through the Due Process Clause of the Fourteenth Amendment is the broad constitutional right that Appellants purportedly infringed. See Wilson v. Seiter, 501 U.S. 294, 296-97 (1991). **2**

The district court ruled that the right to personal security protected by the Eighth Amendment was well established at the time the events underlying this appeal transpired. But, it is axiomatic that defining the applicable right at that degree of abstraction is inappropriate. Anderson, 483 U.S. at 639-40. Rather,

> the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Id. at 640 (citation omitted); see Malley v. Briggs, 475 U.S. 335, 341 (1986) (Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."). Thus, we must inquire whether the established contours of the Eighth Amendment were sufficiently clear at the time of the attack to make it plain to reasonable officers that their actions under these particular circumstances vio-

_____

**2** Because the specific constitutional standard applicable under the Cruel and Unusual Punishments Clause of the Eighth Amendment supplies an "explicit textual source of constitutional protection" for this alleged infringement of Winfield's rights, we need not address a substantive due process claim. Graham v. Connor, 490 U.S. 386, 395 & n.10 (1989). Further, because Appellants are not federal actors, our analysis would be governed by the Fourteenth Amendment rather than the Due Process Clause of the Fifth Amendment in any event. See U.S. Const. amends. V, XIV.

10

lated Winfield's rights. In the context of this case, we ultimately are called upon to decide whether it was clearly established in February 1993 that an unarmed prison official would be deliberately indifferent to an inmate's need for safety if, during an attack by a prisoner armed with a dangerous weapon upon another prisoner, the official instantly mobilized to take control of the situation but failed to intervene immediately. We conclude that it was not.

At the time these events occurred in 1993, it was clear that as a component of their duty to provide inmates with humane conditions of confinement, prison officials were required to"`take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 114 S. Ct. 1970, 1976 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). Further, it was well established that encompassed within that duty was a requirement that prison officials take reasonable steps "`to protect prisoners from violence at the hands of other prisoners.'" Id. (quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir.), cert. denied, 488 U.S. 823 (1988)); see also Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987). Knowledge by prison officials of a sufficiently serious threat of physical harm posed by other prisoners and deliberate indifference to such a risk plainly amounted to a violation of the Eighth Amendment. See Farmer, 114 S. Ct. at 1976-77 & n.2 (noting that Eighth Amendment is violated by prison officials when two requirements met: (1) action or inaction results in or creates a sufficiently serious risk of a deprivation that objectively results in denial of the "minimal civilized measure of life's necessities" and (2) a "sufficiently culpable state of mind"--here deliberate indifference) (internal quotation marks omitted). Nevertheless, the Court has recognized:

> [P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions. Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably

11

> cannot be found liable under the Cruel and Unusual Punishments Clause.

Id. at 1982-83 (citations and internal quotation marks omitted).

We are unable to say that the contours of the Eighth Amendment right, considered at the appropriate level of particularity, were established sufficiently such that a reasonable official would have understood, at that time or indeed today, that Appellants' response to Gibson's attack on Winfield was unreasonable. Certainly, this court had made clear that under some circumstances officials may be liable for completely failing to take any action to avert an attack by one prisoner on another when they knew that a substantial risk of harm existed. See, e.g., Gordon v. Leeke, 574 F.2d 1147, 1152 (4th Cir.), cert. denied, 439 U.S. 970 (1978). However, the undisputed facts here demonstrate[3] that Appellants did not violate this clearly established right of Winfield's. First, it is undisputed that none of the prison officials were aware that Gibson possessed a shank or posed a specific risk to Winfield's safety prior to the moment Gibson emerged from his cell.[4] Thus, the correctional officers became aware of the risk of

---

[3] Although summarily setting forth some of the facts, in judging whether the officers' conduct violated clearly established law, the district court apparently failed to recognize the materiality of other, undisputed facts disclosed in the affidavits submitted by Appellants--particularly those facts surrounding the actions taken by the various corrections officers in response to Gibson's attack on Winfield. Because the information concerning the officers' actions that was revealed in Appellants' affidavits was not called into question by Winfield's opposing submission, either directly or by an appropriate inference from the facts as asserted by Winfield, we properly may consider these facts as undisputed for purposes of addressing the legal issue presented. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

[4] The district court concluded that reasonable officials in Appellants' positions would have known that permissive attitudes toward alcohol and dangerous weapons would violate Winfield's clearly established right to physical safety. This reasoning is misdirected. In assessing whether Appellants are entitled to qualified immunity, the court must inquire whether reasonable officers in Appellants' positions would have recognized that their conduct violated Winfield's rights. See Anderson, 483

12

harm, at the earliest, when Gibson emerged from his cell and assaulted Officer Williams. See Farmer, 114 S. Ct. at 1982 (recognizing that lack of knowledge of the risk is a complete defense to charge of deliberate indifference to a substantial risk of harm). Moreover, it is undisputed that upon seeing Gibson emerge from his cell, the prison officials immediately mobilized to take control of the situation. Officer Walker radioed for assistance instantly. Officer Clatterbuck called out a warning, and all of the officers who had returned to the first floor immediately ran to obtain batons and then proceeded back to the second tier to provide aid in ending the attack. Accepting the undisputed fact that the officers began immediate preparations to safely intervene in the attack as soon as they became aware of the risk, the question becomes whether the two unarmed correctional officers who were present when the attack began violated a clearly established right of Winfield's to have the officials immediately intervene.

Winfield is unable to point to any decisions establishing that an unarmed prison official exhibits deliberate indifference to an inmate's reasonable need for safety, or acts unreasonably, by failing to intervene immediately in an attack by one prisoner armed with a dangerous weapon on another. Indeed, all of the authority of which we are aware leads to the conclusion that such heroic measures are not constitutionally required. See Prosser, 70 F.3d at 1008 ("[P]rison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm."); MacKay v. Farnsworth, 48 F.3d 491, 493 (10th Cir. 1995) (Failure to immediately intervene in physical attack by one prisoner, who was wielding a shank, upon another held not to

_____

U.S. at 640. Thus, the pertinent question is whether the law was clearly established that a failure by prison officials to confiscate immediately alcoholic beverages possessed by inmates (Winfield concedes that no Appellant had any knowledge concerning possession of weapons) constituted an unreasonable response to a substantial risk to inmate safety. Winfield points to no decisions even arguably supporting such a conclusion, and our research has failed to disclose any. We hold that to the extent that the district court based its decision on a failure to confiscate the wine, Appellants were entitled to summary judgment on the basis of qualified immunity.

13

amount to deliberate indifference in part because prison officials had called for backup.); Arnold v. Jones, 891 F.2d 1370, 1372 (8th Cir. 1989) ("[U]narmed prison officials have no duty as a matter of law to physically intervene in a prison fight which may cause them serious injury or worsen the situation . . . ."). The correctional officers violated no clearly established right of Winfield's because they were not required to risk serious bodily harm by entering, unarmed, into a fray with an armed and violent assailant during the short period before assistance arrived. The undisputed facts demonstrate that Appellants' response to the risk to Winfield's safety was reasonable. No clearly established law having been violated, the prison officials were entitled to qualified immunity.**5**

IV.

It appears that the principal source of disagreement offered by the dissent concerns our approach to determining the factual basis to which we must look in resolving the legal question over which we possess jurisdiction--perhaps the most difficult aspect of our review of denials of qualified immunity in an interlocutory appeal and one that has not yet been resolved conclusively by the Supreme Court. See Johnson, 115 S. Ct. at 2159 (noting that question of how an appellate court should determine "what set of facts to assume when it answers the purely legal question about `clearly established' law" presents a serious problem).

The Johnson Court recognized that it will often be possible for an appellate court to utilize the facts that were assumed by the district court in denying the motion for summary judgment. Id. But, the Court also acknowledged that in some instances the district court will fail fully to set forth the facts on which its decision is based. Id. In that circumstance, the Court explained, "a court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party,

_____

**5** Since the corrections officers who were alleged to have been directly involved in the events cannot be found to have violated any clearly established right of Winfield's, Warden Bass, who was not present and whose only connection to the incident was his supervisory role over the officers, cannot be held liable.

likely assumed." Id.; Behrens, 116 S. Ct. at 842. In our view, when a district court fails fully to set forth the facts supporting its legal conclusion that a government official is not entitled to qualified immunity, the court of appeals must review the materials submitted to the district court to determine what the record, viewed in the light most favorable to the nonmoving party, discloses in order to have a factual basis upon which to base its legal conclusion.

The dissent, however, opines that in directing courts of appeals to determine the facts that district courts "likely assumed," the Supreme Court indicated that our task is not to attempt to divine what the evidence viewed in the light most favorable to the plaintiff actually showed. Rather, the dissent suggests that we should construct from the record a set of facts that supports the legal conclusion reached by the district court. See infra pp. 31-33. We cannot agree.

The rationale underlying the Johnson decision was that "precedent, fidelity to statute, and underlying policies," namely "considerations of delay, comparative expertise of trial and appellate courts, and wise use of appellate resources, argue[d] in favor of limiting interlocutory appeals of `qualified immunity' matters to cases presenting [neat] abstract issues of law." Johnson, 115 S. Ct. at 2158. Essentially, the Court concluded that there was little to be gained, incrementally, in terms of providing additional protection to officials and much to be lost in terms of appellate judicial resources by permitting interlocutory appeals maintaining that a district court had erred in concluding that the evidence presented was sufficient to raise a genuine issue of material fact warranting trial. See id. at 2156-59. Accepting as the Johnson Court did, however, that a "cumbersome review" of the record must be undertaken when the district court fails fully to set forth the facts upon which its decision was based, the concerns underlying the holding in Johnson do not counsel in favor of a conclusion that our legal determination should be based upon some mythical set of facts (i.e., a set of facts other than those shown by the evidence actually viewed in the light most favorable to the nonmoving party) that may or may not actually have been relied upon by the district court. Instead, those concerns indicate that the legal decision should be based upon a proper view of the evidence presented, taken in the light most favorable to the nonmoving party. Indeed, the concerns of avoiding unnecessary delay and wise use of judicial resources that led

15

the Johnson Court to its principal holding--that courts of appeals possess jurisdiction to decide only the abstract legal issues on interlocutory review--persuade us that in determining what facts the district court "likely assumed," we must determine what the evidence actually shows when viewed in the light most favorable to the nonmoving party.

Moreover, the Johnson Court indicated that this was the proper course: In discussing the necessity of determining the factual basis upon which our legal ruling will be premised when a district court fails fully to set forth the factual basis for its legal conclusion, the Johnson Court noted that "a rule that occasionally requires a detailed evidence-based review of the record is still, from a practical point of view, more manageable than" a rule requiring courts of appeals to routinely conduct the same type of review. Id. at 2159. Thus, the Court plainly envisioned that on those infrequent occasions when a district court does not supply the factual basis for its decision, we would be required to undertake the type of de novo review that generally would be prohibited.**6**

Furthermore, the dissent's suggestion that the correct view of the factual record is not controlling in determining what the district court "likely assumed," but that instead we should attempt to construct a set of facts supporting the legal decision of the district court, presents an absurd paradox. Employing the dissent's mode of analysis, we would be required to affirm an obviously incorrect legal conclusion, based on "assumed" and equally incorrect facts, simply because we would be required to "assume" that the district court "likely" took an incorrect view of the facts in order to support the incorrect legal conclusion it reached. And, this result, the dissent maintains, is compelled by the Johnson decision--an opinion grounded in concerns of efficiency and judicial economy. In our view, the position advocated by the dissent surely cannot be the one the Supreme Court intended.

_____

**6** That is not to say that when the factual basis for the district court decision denying qualified immunity is unclear, courts of appeals have full jurisdiction to consider an appeal of a factual nature. Instead, consideration of the factual record must be limited to determining the appropriate factual basis for resolving the purely legal issue presented. We recognize, of course, that in practice this distinction may be more theoretical than practical.

16

Finally, none of the other courts of appeals that have addressed what the Supreme Court meant when it instructed that we must determine what the district court "likely assumed" have taken the approach urged by the dissent. See Cottrell v. Caldwell , 85 F.3d 1480, 1491 (11th Cir. 1996) (reviewing record to determine whether genuine issues of material fact existed when district court failed to set forth the factual basis for its legal ruling); Heidemann v. Rother, 84 F.3d 1021, 1027 & n.4 (8th Cir. 1996) (concluding that a determination of what district court "likely assumed" requires court of appeals to undertake usual, de novo review of record to determine what evidence, viewed in light most favorable to the nonmoving party, showed).

Similarly, a question of the proper factual basis for our resolution of the purely legal question over which we possess jurisdiction may arise when a district court bases its decision on stated facts, but other, undisputed, material facts are present that dictate the conclusion that a governmental official is entitled to qualified immunity. For the same reasons that support our conclusion that this court must look to the actual evidence presented viewed in the light most favorable to the nonmoving party when a district court fails to supply the factual basis for its legal decision, we should not ignore other, undisputed, facts in rendering our decision on the legal question. Taking account of an undisputed fact in rendering a legal conclusion neither does violence to "Cohen's conceptual theory of appealability" nor involves this court in the type of weighing of the record that the Johnson Court found unacceptable. Johnson, 115 S. Ct. at 2156-57. Further, a district court does not possess any institutional advantage in the consideration of an undisputed fact, and the acceptance of such a fact does not consume significant appellate resources. See id.  at 2157-58. On the other hand, the failure to acknowledge an undisputed fact could result in considerable delay and inefficiency--for example, if the failure to do so results in the denial of qualified immunity in circumstances when the consideration of the undisputed fact would result in an official's entitlement to it.

In sum, we conclude that when a district court fails to set forth fully the factual basis upon which its legal conclusion that a governmental official is not entitled to summary judgment on the basis of qualified immunity, this court reviews the evidence properly before

17

the district court for purposes of considering the summary judgment question. It then determines what the evidence, viewed in the light most favorable to the nonmoving party, demonstrated. This is the factual basis that the district court "likely assumed" in rendering its legal conclusion and is the factual basis upon which this court must render its decision on the purely legal issues presented in the appeal. Furthermore, when undisputed material facts are present that the district court did not consider in ruling on the qualified immunity issue, this court need not ignore those facts in rendering its legal decision.

REVERSED

WILKINSON, Chief Judge, concurring:

My dissenting colleagues believe they have found in <u>Johnson v. Jones</u>, 115 S. Ct. 2151 (1995), a decision that will doom the defense of qualified immunity once and for all. Hailing this development, they do not let years of qualified immunity jurisprudence, the actual text of <u>Johnson</u>, or the Supreme Court's explanation of <u>Johnson</u> in <u>Behrens v. Pelletier</u>, 116 S. Ct. 834 (1996), stand in their way. Writing in this vein, the dissent reads <u>Johnson</u> to essentially destroy interlocutory appeals under <u>Mitchell v. Forsyth</u>, 472 U.S. 511 (1985). The majority opinion rightly regards <u>Johnson</u> as an important but limited decision which represents neither the termination of meaningful interlocutory review nor the demise of the qualified immunity defense. The dissent, by contrast, would enfeeble the law enforcement function specifically -- and public decision-making generally -- throughout this circuit.

I.

The dissenting opinion has a technical tenor, but no one should mistake its import. As the dissent would have it, <u>Johnson</u> virtually abolished interlocutory appeals of denials of qualified immunity. In actually applying <u>Johnson</u>, the dissent suggests that the only issue still subject to interlocutory appeal is whether the legal right allegedly violated was "clearly established." Finding that Winfield had a "well-settled" right as a prisoner to be "protected against physical harm at the hands of fellow inmates resulting from the deliberate or callous

18

indifference of prison officials to specific known risks of such harm," the dissent concludes that our review under Johnson is complete.

This marks an ominous development for many public decision-makers. Although the dissent is indefinite on the point, the only way this judgment can be affirmed is on the belief that the mere allegation of a clearly established abstract right suffices for a case to go to trial. Whether the abstract legal right asserted by the plaintiff is "clearly established" will rarely be the controversy in a denial of a qualified immunity defense. The primary issue will almost always be whether the given facts demonstrate that the right in question has been violated. The instant case illustrates the point. No one disputes the existence of the Eighth Amendment right alleged; the appeal turns instead on whether undisputed facts disclose a violation of that right. If this central question, whether given facts show a violation of established law, is not subject to immediate appeal, a public official's right to appeal denials of qualified immunity will be of less than little worth.

Even without regard to any other Supreme Court decision, Johnson cannot be read as a rejection of interlocutory review and a reversal of Mitchell v. Forsyth. Indeed, the Court's holding in Johnson was premised on the fact that the "evidence sufficiency" question before it was distinguishable from the qualified immunity issues subject to interlocutory appeal under Mitchell. Johnson, 115 S. Ct. at 2156-58. Furthermore, the plain language of Johnson does not support the destruction of interlocutory review proposed by the dissent. The Johnson Court reaffirmed Mitchell's ruling that an order denying a defendant's motion for summary judgment is immediately appealable:

> where (1) the defendant [is] a public official asserting a defense of "qualified immunity," and (2) the issue appealed concern[s], not which facts the parties might be able to prove, but, rather, whether or not certain given facts show[ ] a violation of "clearly established" law.

Johnson, 115 S. Ct. at 2155. The appellate review authorized under Mitchell and Johnson thus involves two inquiries: (1) what constitutes "clearly established" law, and (2) whether "given facts" demonstrate a violation of such law. See McMillian v. Johnson, 88 F.3d 1554, 1562 (11th Cir. 1996); Shinault v. Cleveland County Board of County

19

Commissioners, 82 F.3d 367, 370 (10th Cir. 1996). And if this were insufficiently clear, the Court repeated itself, stating that "the Mitchell appeal involved the application of `clearly established' law to a given (for appellate purposes undisputed) set of facts," and finding that a district court's conclusion "that a given set of facts violates clearly established law" is a "reviewable determination." Johnson, 115 S. Ct. at 2156, 2159 (emphasis added).

The flaw in the dissent's interpretation of Johnson is evident from its conclusion that the law has taken flight from the facts. The dissent concludes that Winfield's Eighth Amendment right is"well-settled" solely by examining Fourth Circuit precedent. But if the resolution of Mitchell appeals requires no more than the incantation of abstract and settled legal propositions, then Johnson's explanation as to how appellate courts are to identify which facts are"given" for purposes of review becomes meaningless. See Johnson, 115 S. Ct. at 2159. The relevance of any legal proposition will not be clear until the facts to which the proposition is applied become apparent. Inescapably, we must say what the given facts are before we can determine "whether or not certain given facts showed a violation of `clearly established' law." Id. at 2155.

Despite finding the facts irrelevant to its own analysis of the instant case, the dissent next discusses at great length how we are to identify the "given" facts for purposes of interlocutory review under Johnson, at least in those cases where the district court failed to set forth the facts on which it relied.[1] In such cases, Johnson contemplates that appellate courts may be forced to engage in "a detailed evidence-based review of the record." Id. at 2159. Acknowledging this, the dissent insists that we may examine the record in such cases, but only insofar as our review identifies facts which support the district court's decision:

> The best evidence, after all, of what a district court has "likely assumed" as its predicate facts is not what the court of appeals believes it should have assumed, but the district

_____

[1] The dissent thus finally addresses the facts of this case, but only after conceding, solely for purposes of argument, that the court confronts a reviewable issue.

20

court's legal determination that on the facts it <u>did</u> assume (rightly or wrongly) a violation was shown.

Following the dissent's example, we apparently are to comb the record for any scrap of evidence that could justify the trial court's denial of immunity while deliberately ignoring undisputed facts which suggest a contrary conclusion. This is not"review" but a complete waste of time. District courts will simply cease explaining the factual basis for their denials of qualified immunity, and appellate courts will be left to rubber stamp their conclusions. We might as well abolish <u>Mitchell</u> appeals altogether as they will become precisely the "unwise use of appellate courts' time" that <u>Johnson</u> was trying to avoid. <u>Johnson</u>, 115 S. Ct. at 2158.

The dissent thus stands the interlocutory review process on its head. Instead of looking at the facts to determine whether clearly established law was violated, we are to assume that the law was violated and construct a set of "given" facts to support that conclusion. Again, the appellate role as envisioned by the dissent is not to review district court decisions but to rationalize them. The Court in <u>Johnson</u> said nothing of the sort. When a district court has not adequately set out the factual basis for its decision, our review of the record of necessity must be an independent one, and it is incredible to suggest that we should do anything in undertaking it other than apply appropriate summary judgment standards.

II.

The infirmity of the dissent's analysis of <u>Johnson</u> is all the more evident when considered in light of prior and subsequent precedent. The dissent reads <u>Johnson</u> in a virtual time warp, completely disregarding the teaching of <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987), and relegating <u>Behrens v. Pelletier</u>, 116 S. Ct. 834 (1996), the Supreme Court's single explanation of <u>Johnson</u>, to a footnote.

A.

The dissent's suggested resolution of this case is a veritable replica of the Eighth Circuit decision rejected by the Supreme Court in

21

Anderson. The dissent states that the right to be "protected against physical harm at the hands of fellow inmates resulting from the deliberate or callous indifference of prison officials to specific known risks of such harm" was "well-settled" in this circuit at the time Winfield was assaulted. Having made this observation, the dissent finds our review to be complete, without considering whether the undisputed facts entitle the defendants to qualified immunity. Similarly, the Eighth Circuit in Anderson considered the generic right "to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances." Anderson, 483 U.S. at 640. Concluding that this right was "clearly established," the Eighth Circuit refused to consider whether Anderson's specific conduct violated that right and denied him qualified immunity. Id. at 640-41.

The Supreme Court, however, flatly rejected the notion that a court can address the issue of qualified immunity without reference to the given facts of a particular case. The Court held that the right the official is alleged to have violated cannot be considered in the abstract but "must have been `clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640. The Court thus noted, "It simply does not follow immediately from the conclusion that it was fairly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that Anderson's search was objectively legally unreasonable." Id. at 641. The Court recognized that if the question of qualified immunity could be resolved without regard to given facts, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. Harlow [v. Fitzgerald, 457 U.S. 800 (1982),] would be transformed from a guarantee of immunity into a rule of pleading." Id. at 639.

The dissent would hold that Johnson accomplished the very transformation that Anderson forbade. Seeking to cut off interlocutory review, the dissent phrases the right at issue in terms so general that there will always be a sufficient allegation of a violation of clearly established law. Every prisoner plaintiff can plead an Eighth Amend-

22

ment right to protection against fellow inmates. If such an abstract iteration of the right suffices to conclude interlocutory review in favor of the plaintiff, every district court denial of qualified immunity will automatically lead to trial. The dissent thus precludes the possibility that undisputed facts in the particular case will justify an award of immunity.

B.

The dissent pays no more heed to Supreme Court caselaw subsequent to Johnson than it does to Supreme Court precedent prior to Johnson. Behrens, the Supreme Court's single explication of Johnson to date, is relegated to a footnote, perhaps because it represents an apparently vain attempt on the part of the Supreme Court to foreclose precisely the sort of over-reading of Johnson proposed by the dissent. The main holding of Behrens, after all, is that public officers entitled to claim qualified immunity may bring not one but two interlocutory appeals on the question of immunity, 116 S. Ct. at 839, hardly the action of a Court intent on what the dissent has termed a "dramatic curtailment" of such appeals.

Even where contested facts exist, Behrens indicates that purely legal issues remain which an appellate court can consider while respecting the role reserved for trial courts by Johnson. "Denial of summary judgment often includes a determination that there are controverted issues of material fact, and Johnson surely does not mean that every such denial of summary judgment is nonappealable." Behrens, 116 S. Ct. at 842. When reviewing an interlocutory appeal pursuant to Mitchell, Johnson instructs us not to reconsider a district court's summary judgment order "insofar as that order determines whether or not the pretrial record sets forth a`genuine' issue of fact for trial." Johnson, 115 S. Ct. at 2159. We are not to second-guess a trial court on questions of "evidence sufficiency." See id. at 2156. No question of sufficiency is raised, however, when an appellate court finds that the defendant is entitled to qualified immunity even on the plaintiff's version of the facts. As the Seventh Circuit has noted, "If there is no possible resolution of the [factual] disagreement that would save the plaintiff's case from the defense of immunity, the appellate court will not have to resolve any factual disagreements . . .

23

in order to determine whether the defense is good." <u>Anderson v. Romero</u>, 72 F.3d 518, 520-21 (7th Cir. 1995).

Similarly, where the <u>material</u> facts are undisputed, an appellate court's determination that the defendant officers are entitled to qualified immunity does not require any reweighing of the evidence. Appellate courts may determine whether genuinely disputed facts are material without trespassing on the trial court's domain. Materiality "is only a criterion for categorizing factual disputes . . . not a criterion for evaluating the evidentiary underpinnings of those disputes." <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986). Unlike the issue of genuineness, materiality therefore does not consider the sufficiency of evidence supporting a fact but only a fact's legal relevance, whether it "might affect the outcome of the suit under the governing law." <u>Id.</u> Given undisputed material facts, the only remaining issue is the "purely legal determination" whether the defendant's actions were objectively reasonable, in which case "<u>Johnson</u> does not preclude appellate jurisdiction." <u>Lennon v. Miller</u>, 66 F.3d 416, 422 (2d Cir. 1995).

In the instant case, the majority opinion thus appropriately finds that the defendants were entitled to qualified immunity based on the undisputed material facts. Most notably, the court finds that Gibson had to get by the unarmed guard Williams in order to attack Winfield. It is inconceivable that the defendants were deliberately indifferent to a situation which placed one of themselves at risk, a risk that in fact resulted in injury to Williams.**2**

Other circuits have declined to embrace the dissent's constriction of the appellate role in enforcing qualified immunity. In <u>Prosser v. Ross</u>, 70 F.3d 1005 (8th Cir. 1995), for example, the Eighth Circuit reversed a denial of qualified immunity in a case that is the virtual

_____

**2** The dissenting opinion similarly misconstrues <u>Gooden v. Howard County</u>, 954 F.2d 960 (4th Cir. 1992) (en banc), to the extent that it implies that <u>Gooden</u> is inconsistent with <u>Johnson</u> and <u>Behrens</u>. As in this case, the grant of summary judgment in <u>Gooden</u> rested on undisputed facts regarding what the officers perceived at the time of the incident and the objective reasonableness of their actions in light of those undisputed perceptions. <u>See id.</u> at 964-66.

24

mirror image of this one. Prosser, an inmate, complained that Ross, a prison guard, had failed to prevent or respond properly to an attack on him by a fellow inmate. The district court stated, without explanation, that there were issues of material fact which precluded granting summary judgment. Forced to review the record itself, the Eighth Circuit held that it had jurisdiction under Johnson to consider Ross' interlocutory appeal because "the facts required to determine whether Ross is entitled to qualified immunity are not genuinely in dispute." Id. at 1006-07. Based on the facts that the assailant was armed, that the armed attack was unexpected, that Ross was alone, and that he immediately sought help, the court found that Ross had responded reasonably and could not have been expected to prevent the assault.

Other circuits have taken a similar approach to Mitchell appeals and have not hesitated to correct the erroneous application of immunity doctrine where the material facts were undisputed or where the defendant was entitled to immunity even on the plaintiff's account of events. See Foy v. Holston, 94 F.3d 1528, 1531 n.3 (11th Cir. 1996) (awarding qualified immunity and finding that Johnson allows immediate review to consider "whether, taking the facts in the light most favorable to the plaintiffs, clearly established federal rights were violated"); Osolinski v. Kane, 92 F.3d 934, 936 (9th Cir. 1996) (awarding immunity and finding that Johnson allows immediate review when the appeal concerns "whether certain given facts show a violation of clearly established law"); Cantu v. Rocha, 77 F.3d 795, 802 (5th Cir. 1996) (awarding immunity and finding that Johnson allows immediate review when the appeal concerns only "whether an official's conduct was objectively reasonable in light of clearly established law" in light of "a given . . . set of facts"); Anderson v. Romero, 72 F.3d 518, 520 (7th Cir. 1995) (partially awarding qualified immunity and finding that Johnson allows immediate review "[i]f there is no possible resolution of the [factual] disagreement that would save the plaintiff's case from the defense of immunity"); Lennon v. Miller, 66 F.3d 416, 422 (2d Cir. 1995) (awarding immunity and finding that Johnson allows immediate review where an appeal "poses only a legal question about the objective reasonableness of the defendants' actions under undisputed facts"); Sanderfer v. Nichols, 62 F.3d 151, 153 n.2 (6th Cir. 1995) (awarding immunity and finding that Johnson allows immediate review because "the plaintiff's version of events, regard-

25

less of the sufficiency of the supporting evidence, does not state a claim for [ ] a [constitutional] violation").

All of these circuit decisions followed Johnson . All of them involved interlocutory appeals, and all resulted in reversal of a district court's denial of qualified immunity. The dissent's report of the death of interlocutory review would thus appear to be greatly exaggerated, not to mention premature. As these cases illustrate, to adopt the dissent's position would place the Fourth virtually alone among the circuits in refusing to consider whether given facts constitute a violation of clearly established law.

III.

Only by ignoring the importance of interlocutory appeals to the vitality of qualified immunity can the dissent read Johnson as a dramatic curtailment of Mitchell. The dissent tells us that although its interpretation of Johnson "will sometimes force to trial public officials who, under a correct application of qualified immunity doctrine should not be put to trial," this concern "simply must yield to `competing considerations' of `delay, comparative expertise of trial and appellate courts, and wise use of appellate resources.'" (Quoting Johnson, 115 S. Ct. at 2158.) Application of legal doctrine to given facts, however, is an appellate court's area of comparative expertise. And Mitchell has already determined that interlocutory review to correct misapplication of immunity principles does constitute a "wise use of appellate resources." Mitchell likewise indicated that any delay caused by interlocutory review is necessary to give meaning to the Supreme Court's constant admonition that "insubstantial claims should not proceed to trial." Harlow, 457 U.S. at 816; see also Behrens, 116 S. Ct. at 838; Hunter v. Bryant , 502 U.S. 224, 227 (1991); Burns v. Reed, 500 U.S. 478, 494 n.8 (1991); Anderson, 483 U.S. at 640 n.2; Malley v. Briggs, 475 U.S. 335, 341 (1986); Mitchell, 472 U.S. at 526; Davis v. Scherer, 468 U.S. 183, 195 (1984); Butz v. Economou, 438 U.S. 478, 507-08 (1978).

Even the dissent acknowledges that there is a cost to permitting trial of meritless suits against public officers, but it insists that such costs must "simply be tolerated." The dissent trivializes the significance of interlocutory appeals, assuring us, "When occasional error

26

does occur, its effect--of forcing unwarranted trial--is exhausted there; the error is not immunized and may yet be corrected at trial or on later appeal, with liability thereby avoided." Mitchell held the very opposite: that qualified immunity "is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell, 472 U.S. at 526 (emphasis added); accord Swint v. Chambers County Commission, 115 S. Ct. 1203, 1208 (1995); Digital Equipment Corp. v. Desktop Direct, Inc., 114 S. Ct. 1992, 1997 (1994); Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993); Wyatt v. Cole, 504 U.S. 158, 166 (1992); Hunter, 502 U.S. at 227; Siegert v. Gilley, 500 U.S. 226, 232-33 (1991); Lauro Lines S.R.L. v. Chasser, 490 U.S. 495, 499-500 (1989); Van Cauwenberghe v. Biard, 486 U.S. 517, 521 (1988). The dissent assures us that post-trial appellate review can cure any defects, but Mitchell authorized interlocutory appeals precisely because "[a] district court's decision [to deny qualified immunity] is effectively unreviewable on appeal from a final judgment." Mitchell, 472 U.S. at 526.

In thus construing Johnson to eviscerate interlocutory appeals, the dissent engages in wholesale substitution of its own views for the insistent teaching of Supreme Court precedent. The dissent simply projects onto Johnson its own balance of the competing interests at stake. Finding official accountability to the federal judiciary to be of much greater importance than the societal costs of meritless lawsuits, the dissent treats qualified immunity as nothing more than a "mere defense to liability." Having done so, it places little significance on interlocutory appeals and readily concludes that"competing considerations" support the virtual elimination of such appeals. Seeking to make rejections of immunity defenses unreviewable, the dissenting opinion simply ignores the fact that the Supreme Court has long since spoken on the balance between the relevant interests, and that we are not free to revisit the question. The dissent's position might have been appropriate for an advocate arguing Mitchell, but at this late date it is only an argument for overruling Mitchell, which the Supreme Court has not seen fit to do.

IV.

Interlocutory appeals of qualified immunity denials serve several critical functions. They draw the line of demarcation between the

27

objectively reasonable exercise of official discretion on the one hand and the violation of clearly established rights on the other. By requiring review prior to trial, they also constitute a check on the reflexive resort to trials that would eventually erode the exercise of official discretion and nullify the qualified immunity defense.

Discretion is thus at the core of what the interlocutory appeal protects. Not absolute discretion -- but limited, qualified latitude in making judgments. If we are to have few interlocutory appeals and many trials, the drastic expansion of litigation will mean the equally drastic constriction of discretion. Yet every occupation-- be it teacher, parent, corporate executive, or county clerk -- demands the exercise of channeled discretion. Law enforcement is no exception. Officers "routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them." Davis , 468 U.S. at 196. Decisions involving public order "are more likely than not to arise in an atmosphere of confusion, ambiguity, and swiftly moving events," Scheuer v. Rhodes, 416 U.S. 232, 246-47 (1974), and involve the application of legal standards that are notoriously imprecise, such as "probable cause" and "excessive force." Officers are not jurists; they "must often act swiftly and firmly at the risk that action deferred will be futile or constitute a virtual abdication of office." Id. at 246. Like many executive officials, law enforcement officers thus are "called upon to act under circumstances where judgments are tentative and an unambiguously optimal course of action can be ascertained only in retrospect." Butz, 438 U.S. at 500 n.28.

Under such conditions, even an official of the highest integrity and competence will occasionally err. Without the protection of discretion afforded by qualified immunity and interlocutory review, every mistake "`expos[es] such [officers] as have been honestly mistaken to suit by anyone who has suffered from their errors.'" Barr v. Matteo, 360 U.S. 564, 571 (1959) (quoting Gregoire v. Biddle , 177 F.2 579, 581 (2d Cir. 1949)). Public officers are irresistible targets for meritless lawsuits. See Butz, 438 U.S. at 509-10; Imbler v. Pachtman, 424 U.S. 409, 425 (1976). From detention through incarceration, nearly every type of law enforcement action is almost certain to invoke the ire of its subject, providing a constant stream of potential plaintiffs with recurring motives to sue. Onto this pyre of litigation, the dissent pours

28

yet more fuel, discarding one of the few deterrents to litigious action that still exists.

The legal order that the dissent would construct risks rendering law enforcement officers so fearful of lawsuits that they will simply cease protecting the public. <u>Cf. Wood v. Strickland</u>, 420 U.S. 308, 319-20 (1975) (threat of liability will "undoubtedly deter even the most conscientious school decisionmaker from exercising his judgment . . . in a manner best serving the long-term interest of the school and the students"). After all, the safest course is not to exercise one's discretion, but not to act at all. Doing nothing may not enforce the law or protect the peace, but it most assuredly will minimize an officer's chances of becoming a section 1983 defendant.**3**

If interlocutory review of immunity denials is no longer possible, then extended discovery and trials of law enforcement actions will become a way of life. Yet litigation is decidedly not what law enforcement officers do for a living. Time in court is time off the street. Whatever incentives may attract persons to the law enforcement profession cannot include the prospect that every step one takes may turn into a policeman's nightmare and a litigator's dream.

Perhaps fearing the arbitrary exercise of discretion, the dissent pursues an ideal that will never exist, one where frequent trials of police-citizen encounters will sustain every instance of proper official conduct, while excising with surgical precision every mistake. This vision exists on an ever-receding horizon. The rule of law will not flourish without the aid of law enforcement, and, until men become angels, their discretionary actions will be accompanied by mistakes. But authority in the position of continually having to justify itself will not be able to assert itself. If the dissenting position becomes the law, the search for the perfect will have become the lasting enemy of the good.

Judges Russell, Widener, and Hamilton authorize me to say that they join in this opinion.

_____

**3** As the circumstances of this case suggest, inaction is not an ironclad defense against suit, but it will remain an official's most secure protection against constant trials in the absence of interlocutory review.

29

DIANA GRIBBON MOTZ, Circuit Judge, concurring:

I concur in the judgment and in Judge Wilkins' careful and narrow opinion for the majority of the court. Of course, I recognize that the court's holding is, as Judge Phillips' thoughtful dissent well demonstrates, in some tension with the principles set forth in Behrens v. Pelletier, 116 S. Ct. 834 (1936) and Johnson v. Jones, 115 S.Ct. 2151 (1995). However, I cannot conclude that when, as here, a district court does not adequately set forth the facts it finds in dispute, the Supreme Court intended that we determine the facts the district court "likely assumed" other than by examining, in the light most favorable to the plaintiff, the factual record before the district court and then determining if those facts set forth a violation of clearly established law.

I write separately simply to note that in this case we have no occasion to reach the question of whether we are also at liberty to follow this approach when the district court has adequately set forth the facts it finds in dispute. That is, in this more usual case, do we have jurisdiction to go beyond the district court's holding and plumb the summary judgment record to make our own assessment as to what are the material facts, taken in the best light for the plaintiff, or are we limited to the facts relied upon by the district court. Behrens and Johnson would seem to hold that we must accept the facts as relied upon by the district court. However, resolution of that question must await another day.

PHILLIPS, Senior Circuit Judge, dissenting:

I differ fundamentally with the en banc majority's apparent understanding of what Johnson v. Jones, 115 S. Ct. 2151 (1995), has instructed us on the scope of our jurisdiction to review interlocutory orders denying motions by § 1983 defendants for summary judgment on qualified immunity grounds. On my different understanding and application of the jurisdictional principles of that decision, I would hold that because this appeal seeks only to challenge a fact-related, evidence-sufficiency determination it should be dismissed. Alternatively, if it be considered that the appeal seeks also to challenge a purely legal determination properly presented for our review--a premise I believe not warranted--I would affirm the ruling.

30

I

To get at the difference in our understandings of Johnson, I start by laying out my understanding of its holding and of its more important implications for this case.

A.

Johnson was taken for review by the Supreme Court specifically to clarify that which Mitchell v. Forsyth, 472 U.S. 511 (1985), had held was immediately reviewable by interlocutory appeal from district court orders denying summary judgment motions on qualified immunity grounds. Clarification was required because some circuits-- including this one--had misunderstood Mitchell on this critical point. See Johnson, 115 U.S. at 2154 (citing, inter alia, Turner v. Dammon, 848 F.2d 440, 444 (4th Cir. 1988), among cases reflecting erroneous view of jurisdiction).

The basic point of clarification is clear. The only immediately reviewable determination embodied in (or constituting the sole basis for) such an order is the "purely legal one," see Johnson, 115 S. Ct. at 2156, that if the facts were as the district court assumed them to be for summary judgment purposes, defendant's conduct would have violated a then clearly established constitutional (or statutory) right of plaintiff of which a reasonable official in defendant's position would have known. Id. at 2155-2156. Not immediately reviewable are "fact-related," id. at 2153, determinations embodied in (or constituting the sole basis for) the denial, that genuine issues of material fact respecting the qualified immunity defense prevent the grant of summary judgment. Id. at 2156-2158. The reasons for the reviewable/ not-reviewable distinction are found in the collateral order doctrine of Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949), upon which Mitchell is based, principally in Cohen's separability requirement: the "purely legal" issue is separable from the merits of the § 1983 claim; the "fact-related" issue inevitably will be intertwined with the merits to some extent. Id. at 2156 (legal issue); 2157 ("evidence-insufficiency" issue).[1]

_____

**1** A possible semantical problem in making the required conceptual distinction should be noted. Both of the issues that can be raised by motions

31

B.

How do these two different types of determination emerge in the litigation process to provide the basis for this critical jurisdictional distinction? The answer can best be found by keeping in mind the substantive elements of the qualified immunity affirmative defense and tracing out the adversarial processes of party presentation and default by which those elements may be put in issue and withheld or removed from issue at the trial and appellate levels. Recall first the substantive anatomy of the qualified immunity defense. It is an affirmative defense--in the same confession-and-avoidance mode as release, accord and satisfaction and the like--rather than a simple denial of one or more of the essential elements of the § 1983 claim. It invokes the immunity principle that even if the§ 1983 claim has merit (which ordinarily will be denied) the defendant is not liable and may not be put to trial because the right allegedly violated was not one so clearly established at the time of the conduct charged to the defendant that a reasonable official in his position would have known

_____

for summary judgment on qualified immunity grounds--whether the facts, as assumed, show a violation of a clearly-established right of which a reasonable official in defendant's position would have known, and whether there are genuine issues of material fact respecting a factual basis for the defense--are issues of law whose resolutions require determinations "as a matter of law." See Mitchell, 472 U.S. at 528 n.9 (whether violation shown); Anderson v. Creighton , 483 U.S. 635, 641 (1987) (whether genuine issues of material fact exist). The required distinction, therefore, is not between determinations"of fact" and determinations "as a matter of law," but, as the Court put it, between "fact-related" determinations (the genuine-issue determination), see Johnson, 115 U.S. at 2153, and "purely legal" determinations (that on facts assumed, a violation is shown). See id. at 2156. That particular "legal issues" may be so "fact-related" as not to be "pure" legal issues for particular procedural purposes is a general proposition that has been recognized in other contexts. See, e.g. Griffin v. United States, 502 U.S. 46, 58-59 (1991) (insufficiency of evidence to convict on one of alternative factual theories is not ground for vacatur of general verdict of guilt where other ground is supported; though technically a"legal error," evidence insufficiency involves a "mistake concerning the weight or the factual import of evidence" that is not the kind of "legal error" concerning a "mistake about the law" that would require vacatur).

32

that the conduct charged would violate that right. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). There are both legal and factual elements in this defense-principle: purely legal issues respecting the state of the law at a particular time and factual issues respecting the circumstances under which the charged conduct occurred, such as whether the defendant was involved at all or in the critical way charged; whether there were exigencies affecting the objective reasonableness of the conduct charged, etc. <u>See Anderson</u>, 483 U.S. at 641 (actual information possessed); <u>Malley v. Briggs</u>, 475 U.S. 335, 350 (1986) (Powell, J., concurring and dissenting) (exigencies of time and circumstance).

A defendant invoking the defense in the district court by motion for summary judgment may therefore base his motion on either purely legal, or factual, or both grounds. <u>See Johnson</u> , 226 S. Ct. at 2158 (pointing out that motion's grounds serve to identify basis for its denial). His motion may, for example, be rested solely on some variant of the following factual positions: (1) assuming (or conceding) that the conduct charged to me would constitute a violation of clearly-established constitutional right, etc., I didn't do it (the <u>Johnson</u> defense); or (2) assuming (or conceding) that the conduct charged to me did violate the right alleged, the factual circumstances were such that I acted under reasonable misapprehension that it would not do so. <u>See Anderson</u>, 483 U.S. at 646-47 n.6. Both of these positions present only factual grounds for the immunity defense; no <u>purely</u> legal issue has been raised in the district court, hence none is a potential issue for appellate review. Whether summary judgment should be granted depends entirely upon whether there are genuine issues of fact respecting the ground of defense ("didn't do it," or "reasonably mistaken under the circumstances"), and a decision denying summary judgment necessarily rests only on a determination that there are such issues, i.e., that the non-movant's forecast of opposing evidence is sufficient to hold the factual defense at issue. If the defendant then attempts to appeal such a denial order, the appeal should be dismissed, as necessarily seeking review only of the"fact-related" determination which is the order's sole basis. This is the type of "simple" case, for jurisdictional purposes, represented for example by <u>Johnson</u> itself. <u>See Johnson</u> at 2153-2154, 2158.

On the other hand, a defendant's motion may be rested solely on the "purely legal" issue. It would, for example, if it took the position

33

that (3) assuming (or conceding) that the conduct charged to me did occur as charged, it did not constitute the violation of a then clearly established constitutional right. See Mitchell , 472 U.S. 511, 535 (1985) (only issue would then be whether "question was open at the time the officer acted"). This presents no "fact-related" issue, and a denial of summary judgment by the district court would necessarily rest only on a determination that as a matter of law the conduct assumed or conceded did constitute violation of a well-established right, etc. An appeal from this order thus lies for review of the "purely legal" determination which necessarily is the sole basis for the denial. This, too, is a "simple case" for making the jurisdictional distinction.

C.

But, as the Johnson Court recognized in responding to cogent arguments that making the required jurisdictional distinction frequently would be too conceptually difficult, or too subject to party manipulation, or too subject to uninformative district court records, see id. at 2158-2159, things can get much more complicated for jurisdictional purposes. This is most likely to occur where a defendant has rested his motion on both purely legal and fact-related grounds in the district court. For example, by contending in his motion both, or alternatively, that (4) assuming the conduct charged to me did occur as charged, it would not constitute violation of a clearly-established right, etc. (purely legal) and, in any event, it did not occur in that way, but while I was absent from the scene (fact-related). Whether or not cleanly reflected in the record, every denial of such a two-pronged motion must, as a conceptual matter, involve determinations both that the conduct as charged did violate a clearly established right, etc. and that genuine issues of material fact respecting the defendant's asserted absence from the scene prevented granting summary judgment on that ground. And, because it necessarily involves, whether or not expressly stated, the purely legal determination, such an order, per Johnson, is "appealable" (reviewable)"to [that] extent." Id. at 2156 (quoting Mitchell, 472 U.S. at 530). Which means that it is not "appealable" (reviewable) with respect to the fact-related, genuine issue determination, either as a matter of primary or, except perhaps in exceptional cases, pendent jurisdiction. See id. at 2159.**2**

_____

**2 Behrens v. Pelletier**, 116 S. Ct. 834 (1996), provides an interesting example of a case treated by the Supreme Court as involving such an

34

D.

Everything said to this point about the appealability (immediate reviewability) of qualified immunity denials under Johnson has assumed that the defendant will properly have invoked the court of appeal's power to review that which Johnson says it may review. But Johnson does not purport (nor does any other Supreme Court decision of which I am aware) to alter for qualified immunity cases the normal rules of party presentation and default of issues potentially subject to appellate review. Therefore, notwithstanding the appealability under Mitchell and Johnson of any purely legal determination embodied in a qualified immunity/summary judgment denial, reviewability of such an order in a particular case yet depends upon the defendant's having properly raised it in the district court and preserved it for review under the relevant trial and appellate procedural default rules. E.g., Fed. R. Civ. P. 46 (contemporaneous objection rule); Fed. R. App. P. 28(a)(2), 28(b) (issues for review must be identified in brief).

E.

This all means that when it appears from the record that a defendant-appellant is seeking review of a determination that there

_____

alternatively based motion and therefore a dually-based denial order. Though principally concerned with whether under Mitchell public officials could successively appeal denials of 12(b)(6) motions to dismiss and Rule 56 motions for summary judgment on qualified immunity grounds, the Court had also to deal with the respondent's alternative contention that the summary judgment denial order was not in any event appealable under Johnson because it was expressly based on a determination that "[m]aterial issues of fact remain." Id. at 842 (internal quotation marks omitted). Not so, said the Behrens Court: "denial of summary judgment often includes a determination that there are controverted issues of material fact . . .", id., but this does not mean that where, as in the case at hand, the denial also "necessarily determined that certain conduct attributed to petitioner (which was controverted) constituted a violation of clearly established law," the latter determination also is not appealable. Id. It is appealable under Johnson said the Court, which then reversed the court of appeals' dismissal and remanded to that court to undertake review of the purely legal determination. Id.

35

are genuine issues of material fact respecting a factual ground of his qualified immunity defense ("didn't do it";"reasonably mistaken in doing it") that require denial of his motion, the appellate court may not address to any extent the correctness of that determination. Not having jurisdiction to review it, the court may only dismiss the appeal if, as in Johnson, the genuine-issue determination is the sole basis for the denial, see Finelli v. Tabb, 67 F.3d 67 (4th Cir. 1995) (so holding), or decline to review it when the denial order is based upon both a reviewable purely legal determination and the non-reviewable genuine-issue determination. See Johnson, 115 S. Ct. at 2159 (no jurisdiction to review an order "insofar as that order determines whether or not the pretrial record sets forth a`genuine' issue of fact for trial") (emphasis supplied).

Though, as the Johnson Court expressly noted, disallowing interlocutory review of erroneous genuine-issue determinations will sometimes deprive officials of the pre-trial and trial-avoidance benefits of qualified immunity to which they are entitled, the jurisdictional limitations on Cohen collateral order review power compel that result. See id. at 2158.

F.

Assuming, however, that a purely legal determination is properly presented for review, what exactly is reviewed? More specifically, does the court of appeals accept the district court's identification of the factual predicate for that court's legal determination and, accepting it, review only the resulting "purely" legal determination? Or may the court of appeals review for error in the district court's identification of the factual predicate that it assumed for summary judgment purposes? For example, suppose the district court expressly identifies as the facts it assumed for summary judgment purposes that the defendant, a prison guard, deliberately failed for twelve hours to notify an available prison doctor that the plaintiff-inmate had suffered a broken leg. May the court of appeals do more than consider whether, on that factual predicate, there would have been a violation of clearly established Eighth Amendment rights of which a reasonable official in defendant's position would have known? Could it, for example, reject the factual predicate, hence the legal determination, on the basis that under summary judgment procedure rightly applied

36

it was undisputed that notice was given within three minutes of actual knowledge?

Though the consequence may seem severe, <u>Johnson</u>'s answer is plain. Review is confined to the "purely" legal issue whether, accepting the district court's factual predicate, a violation of clearly established law would have occurred. This appears in various ways in the Court's explanation of why review must be confined, in faithfulness to <u>Cohen</u>'s jurisdictional limitations and to a proper allocation of trial and appellate functions, to <u>purely</u> legal determinations rested upon assumed factual predicates.

First off, the Court emphasized the jurisdictional compulsion to confine review in this way. Interlocutory appeals of qualified immunity/summary judgment denials, said the Court, best serve the final judgment rule, "if they [are] limited to cases presenting neat abstract issues of law." <u>Id.</u> at 2158 (quoting 15A Wright & Miller § 3914.10, at 664). As is evident, this legal issue can only be addressed as an "abstract" one if its resolution does not involve review by courts of appeals of the factual predicates upon which the district court made its determination. This is borne out in <u>Johnson's</u> discussion of how courts of appeal are to identify the factual predicates for the district courts' purely legal determinations when those courts "simply deny summary judgment without indicating their reasons for doing so." <u>Id.</u> at 2159. Easily done, said the <u>Johnson</u> Court, when the district court has expressly "stated" the facts it has assumed in denying the motion. In that situation, said the Court, "the court of appeals can simply take, as given, the facts that the district court assumed," and assume the same "set of facts" "when it answers the purely legal question about `clearly established' law." <u>Id</u>. And, where the district court has not performed the helpful task of stating the facts it has assumed so that this must be sought by the court of appeals in "a cumbersome review of the record," the search still is only for "what facts the district court, in the light most favorable to the non-moving party <u>likely assumed</u>," <u>id.</u> (emphasis supplied), not for what it <u>should have assumed</u>.**3**

_____

**3** Conceptually, abstraction into "pure" law occurs in the process of taking as a "given" or as "undisputed" "for appellate purposes" the facts

37

Can the Court actually have intended interlocutory review to be limited in this further way--that is, in addition to the genuine-issue limitation? The consequence will be an inability of courts of appeals to correct manifest district court error in identifying the facts properly to be assumed for summary judgment purposes, and resulting error in denying a defendant's entitlement to qualified immunity in advance of trial. This is a serious consequence, but it is one no more inimical to the purposes of qualified immunity than is the clear inability of courts of appeals--under Johnson--even to address manifest district court error in making "evidence-sufficiency" determinations.**4** And, as the Johnson Court pointed out, the fact that that flat jurisdictional limitation will sometimes force to trial public officials who, under a correct application of qualified immunity doctrine should not be put to trial, simply must yield to "competing considerations" of "delay, comparative expertise of trial and appellate courts, and wise use of appellate resources." Id. at 2158. In other words, occasional district court error in denying summary judgment either on the grounds that there

_____

assumed by the district court as predicates for its legal determination. See Johnson, 115 S. Ct. at 2156, 2159; see also Behrens, 116 S. Ct. at 842 (public official may "claim on appeal that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the Marlow standard of `objective legal reasonableness'") (emphasis added).

**4** As a moment's reflection will demonstrate, if de novo review of the district court's identification of the factual predicates for its purely legal determination is not precluded, courts of appeals can by that means effectively engage in the very evidence-sufficiency review that Johnson directly forbids. To ask the question what facts the district court should have assumed in determining whether, applying the summary judgment standard, they showed a violation of clearly established right of which a reasonable official in defendant's position would have known, is indistinguishable in practical effect from the process of asking whether there were, as determined by the district court, genuine issues of fact respecting whether under the circumstances a reasonable official in defendant's position would have known that his conduct would violate the claimed right.

It is exactly by this back-door route that I believe the majority in this case has effectively conducted the de novo genuine-issue review forbidden by Johnson. See Part II.B., post.

38

are genuine issues of fact respecting a factual ground of qualified immunity defense ("didn't do it" or "reasonably mistaken") or in identifying the factual predicate for a purely legal ground of defense ("facts assumed don't constitute violation of well-established constitutional right"), must, in deference to countervailing considerations, simply be tolerated.

G.

In sum, I read Johnson as having confined interlocutory appellate review of district court orders denying motions for summary judgment on qualified immunity grounds to a narrow,"abstract" issue of "pure" law: whether "tak[ing] as given" the facts assumed (rightly or wrongly) by the district court, id. at 2159, those facts show a violation of clearly established law, etc. This means that interlocutory review is not available with respect either to (1) determinations by district courts that there are genuine issues of material fact respecting a factual ground for the defense which require the denial or (2) determinations by district courts of those facts that are to be assumed, for summary judgment purposes, in deciding whether they show a violation of clearly established right of which a reasonable official in defendant's position would have known.

This involves a dramatic curtailment of the scope of interlocutory review which was thought proper in this--and other--circuits before Johnson's clarification of Mitchell. Our understanding, plainly revealed in our cases, was that "fact-related," genuine issue determinations as well as purely legal determinations were reviewable on interlocutory appeals of right under Mitchell . See, e.g., Turner, 848 F.2d at 444 (4th Cir. 1988) (jurisdiction assumed to conduct de novo record review of district court's determination that genuine issues of fact respecting factual grounds of defense precluded grant of qualified immunity motion; district court affirmed); Gooden v. Howard County, 954 F.2d 960, 965-966 (4th Cir. 1992) (en banc) (same; district court reversed).

The more limited scope of review mandated by Johnson necessarily will allow district court errors in these fact-related determinations to go undetected at the summary judgment stage and so will deprive some public official defendants of the trial avoidance benefits to

39

which qualified immunity entitled them. This, however, is a risk of which the Johnson Court was expressly aware and which it thought nevertheless compelled by jurisdictional constraints on collateral order review and by considerations of prudent judicial administration. See Johnson, 116 S. Ct. at 2158.

To put those risks in perspective, two points should be noted. (1) The practical effect is not to abrogate but only to allocate to the district courts final responsibility for two fact-related determinations in pre-trial qualified immunity applications; errors in those determinations will--as in all matters--be the rare exception rather than a frequent occurrence in those courts. (2) When occasional error does occur, its effect--of forcing unwarranted trial--is exhausted there; the error is not immunized and may yet be corrected at trial or on later appeal, with liability thereby avoided. In any event, as I understand Johnson, its fundamental point is that the game--of laborious interlocutory evidence review--is simply not worth the candle--of identifying and correcting the occasional district court error that will occur both in identifying genuine issues of fact respecting factual grounds of the defense and in identifying the factual predicates for denials of summary judgment on purely legal grounds.

II

On this understanding of Johnson and its implications for this case, I would dismiss this appeal on the basis that the appellants' appeal only seeks review of the district court's unappealable fact-related determination that there are genuine issues of material fact respecting "what happened," hence of the objective reasonableness of their conduct.

Assuming, however, for purposes of this case that somehow--as the majority has concluded--the appeal properly presents for our review a district court determination of the purely legal issue-- whether on the facts assumed a violation of clearly-established law, etc., was shown--I would affirm that determination.

I take these in order.

A.

On any fair reading of the record in this case, the only determination by the district court that appellants have sought to "appeal" is the fact-related determination that there were genuine issues of material fact respecting "what happened," hence whether what happened involved their violation of a clearly established right, so that summary judgment was inappropriate.

To demonstrate that, we should start with the appellants' motion for summary judgment as made and supported in the district court. See Part I.B. ante. In that motion, which sought dismissal both on the merits and on qualified immunity grounds, the appellant-officers did not, as I read the record, actually contend that as a matter of law Winfield's complaint did not allege a violation of constitutional right, nor, alternatively, that the right allegedly violated was not then clearly established. Instead, as shown in their motion papers, they effectively conceded that under such decisions of this court as Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987), the right asserted by Winfield of convicts to be "protected against physical harm at the hands of fellow inmates resulting from the deliberate or callous indifference of prison officials to specific known risks of such harm" was then well-settled in this circuit. J.A. 14, 72. Their qualified immunity defense was therefore not rested on the purely legal ground that assuming the conduct charged to them occurred, it would not have constituted a violation of that clearly established right. Instead, it was rested on the purely factual ground that "the facts do not give us such a case here;" that on the "actual" facts as asserted in their supporting affidavits, their conduct could not have constituted violation of the acknowledged right because it lacked the requisite deliberate indifference. See id. This is a factual defense essentially indistinguishable from the simple "weren't there, didn't do it" factual defense that was raised as the sole basis for the officers' motion in Johnson.5 See Part I.B.ante.

_____

5 Though a factual defense of this sort--"didn't do it," or "didn't have the requisite intent"--goes as well to the merits of a § 1983 claim, its assertion as the basis for qualified immunity dismissal is both conceptually sound and practically warranted. And it of course provides the most complete example of an intertwining, hence inseparability for interlocutory review purposes, of the claim on the merits and the qualified immunity defense. See Johnson, 116 S. Ct. at 2157, 2158.

41

The district court's opinion denying the two-pronged motion, though not as helpful for purposes of making the Johnson distinction as we might wish,**6** is plain enough for our purposes. The court's memorandum opinion conflated its rulings on the merits and qualified immunity grounds of the motion. As to the merits defense, which was rested essentially on the same factual "no deliberate indifference" grounds as was the qualified immunity defense, the court expressly concluded that "there are genuine issues of material fact," that "[i]ndeed . . . this case is peculiarly fact-specific and should proceed to trial on the merits." J.A. 80.

Specifically addressing the qualified immunity defense, the court then opined that the constitutional right asserted in Winfield's complaint and responsive affidavit was--as appellants had effectively conceded--well-settled at the time of the assault. **7** J.A. 81. Having already determined, in ruling on the merits defense, that there were

_____

**6** Which is said with no implied criticism of the court. Under this court's pre-Johnson precedents, neither litigants nor district courts were on notice of any need for special precision in making and ruling on summary judgment motions on qualified immunity grounds. Under our unrestricted scope of review regime, we had no occasion to differentiate between the fact-related and purely legal grounds of orders denying summary judgment, and litigants and district courts therefore properly felt no compulsion to help us in that respect.

That we deal in this case--deemed by a majority of the court to be sufficiently important for en banc consideration--with such an imprecise record may well suggest the improvidence of that decision. Hard cases, in the substantive sense, tempt courts to make bad law, and so may poorly developed records, particularly those created under a procedural regime which no longer controls on appeal. But--here we are.

**7** Here is one of the anomalies that might be expected in a pre-Johnson district court ruling in this circuit, and that probably will not recur under the new regime. See note 6, ante. As indicated, the defendant officers did not--certainly did not clearly--raise the "purely legal" issue in their motion, instead apparently conceding or assuming it arguendo, in relying solely on their factual defense. The district court's ensuing statement that the right asserted was a well-settled one was therefore probably not technically a "determination" of a contested legal issue, but a passing comment that could not have been thought in pre-Johnson days to have any consequence for interlocutory review of the denial order.

42

genuine issues of material fact respecting "what happened," the court did not expressly reiterate that conclusion with respect to the qualified immunity defense. But it is manifest that the existence of genuine issues respecting "what happened," hence whether the appellants' conduct was as a matter of law objectively reasonable (not deliberately indifferent), was the basis for the court's denial. For the court specifically identified as controverted facts it considered material to the defense Winfield's assertions in affidavit that some of the appellant-officers were forewarned of the risk posed by Gibson to other inmates' safety by their knowledge that he had a weapon and had been consuming alcohol. Assuming that were true, the court opined "the officers [were] bound to know that the safety of other inmates was at risk" and that their "permissive attitude . . . would violate the inmates' right to continued protection and security." Without further elaboration on the factual issues, the court then denied the qualified immunity motion.

It seems clear that at this point in the record the district court had determined (rightly or wrongly) that there were genuine issues of material fact respecting "what happened" that required denial of the motion. It is less clear, but possible, that it had also made a "purely legal" determination--thinking the issue had been raised--that on the facts as it assumed them a violation of clearly established law of which reasonable persons in the officers positions would have known was shown. In any event, whatever the determinations actually made, the officers could not under Johnson appeal the denial order insofar as it rested on a genuine-issue determination, but only insofar as it rested on any "purely legal" determination that was made. Furthermore, even if there was a purely legal determination that was appealable, it is not entitled to review on this appeal--absent extraordinary circumstances--unless properly presented for our review.

To take the next step in the jurisdictional inquiry we must then determine from the record what issues the appellants have sought to "appeal." How do we do this? The notice of appeal ordinarily will not tell us; it is required only to identify the "order, or part thereof" from which appeal is taken, and not the legal rulings on which it is based. Fed. R. App. P. 3(c). So, the notice of appeal here does not perform the required service. See J.A. 83. If the Federal Rules of Appellate Procedure are properly observed, the appellants' brief should tell us,

43

for the "issues" section of the appellant's primary brief is required to include "[a] statement of the issues presented for review." Fed. R. App. P. 28(a)(3). The brief in this case regrettably does not do so. With respect to the district court's denial of the motion for summary judgment on qualified immunity grounds, the issue is stated in unhelpful general terms simply as "whether the officers are entitled to qualified immunity as to all of Winfield's claims." J.A. 8. We get the answer here with sufficient precision, however, in the argument section of the appellants' brief. There, in the portion devoted to their qualified immunity defense, it is plain that the officers do not challenge (as they did not in the district court) the district court's observation (determination?) that the constitutional right alleged was "clearly established" at the critical time, but only the court's essential determination that there were genuine issues of material fact respecting the reasonableness of the officers' conduct. The entire burden of the appellants' argument is that the evidence was insufficient to create a triable issue of material fact on this element of their defense and that on the undisputed evidence they had not violated Winfield's right by their failure to intervene to protect him. J.A. 20-26. Their argument on the point is summed up in the assertion that on the summary judgment record, there was "[n]o dispute regarding the reasonableness of . . . these officers' perceptions." J.A. 21-22.

The district court, however, determined that there <u>was</u> such a dispute. And, because that fact-related determination is the only one sought to be appealed by appellants and as such is not appealable under <u>Johnson</u>, I would dismiss this appeal. **8**

_____

**8** No one could suggest that this is one of those cases where, in an exercise of our discretion, we should, because of special circumstances, consider an issue not actually raised and determined by the district court. <u>See</u> <u>Singleton v. Wulff</u>, 428 U.S. 106, 120-121 (1975) (general rule subject to exception only in special circumstances such as the need to avoid "clear injustice" or where "resolution is beyond any doubt"). This surely is no such case. Indeed, the ambiguous record and novelty, for us, of the issues presented strongly militate against using this case as a vehicle for definitive exploration and application of <u>Johnson</u>'s new (for us) appellate review regime.

44

B.

The majority, however, has concluded that the appeal properly seeks and properly presents for our review a purely legal determination that is appealable under Johnson. As indicated, I disagree with that, believing (1) that no such issue was actually raised for determination by the district court and (2) that if it was, the district court's determination has not been properly presented for our review on this appeal.

Assuming, however, that such a determination was made and is properly before us, I would affirm it. The question presented, if the issue is before us, is whether the facts assumed by the district court show a violation of clearly established right of which reasonable officials in appellants' position would have known.

The majority, extensively reviewing the summary judgment materials before the district court, concludes that no such violation was shown. But it is obvious that this conclusion is reached not on the basis of the facts "likely assumed" by the district court, but on the basis of facts the majority concludes should have been assumed by that court on a right application of summary judgment principles. Indeed, the majority says--in the course of directly responding in Part IV of its opinion to the opposing position of this dissent--that this is exactly what it has done. See ante at 16. And, it purports to find authority for doing so in what it perceives as the course "plainly envisioned" by the Johnson Court: that "on those infrequent occasions when a district court does not supply the factual basis for its decision, we would be required to undertake the type of de novo review that generally would be prohibited." Id.

With all respect, this is not, as a simple matter of textual exegesis, what the Johnson Court indicated that it"envisioned." Had it been what was intended, the Court surely would have said a very simple thing, such as: "When, however, the district court has failed (completely [?] or sufficiently [?]) to identify the predicate facts for its purely legal determination, then, as a matter of necessity, the court of appeals must make its own de novo determination, applying summary judgment standards, of the predicate facts properly to be assumed." The Court said no such thing, nor can such a reading be implied from

45

anything it did plainly say. Perhaps the majority--and the other courts which it says agree with its reading of <u>Johnson</u> on this point--believe that this is what the Court <u>must</u> have had in mind, or <u>should</u> have had in mind, given the difficulty of divining from a summary judgment record what another court "likely assumed." But that of course is not our function in interpreting Supreme Court mandates. And, in any event, as I believe can be demonstrated, the process is not that difficult for courts already required on occasion to divine the likely holdings of highest state courts on matter of state law, or what "jurists of reason" likely would think about the "newness" of a constitutional rule, or whether four Justices of the Court likely would vote to grant a petition for certiorari, etc.

Turning to that process here, the proper question for us is what facts the district court "likely assumed" as that can be gleaned from the admittedly unusual record search that <u>Johnson</u> recognized might be forced by the district court's failure specifically to "state" them? How do we find facts "likely assumed" without simply doing what the majority has done here: simply impose on the district court the <u>proper</u> factual assumption and review its legal determination for error on that basis? Surely we must pay some attention--though we seek only what was likely assumed rather than what should have been--to what summary judgment procedure properly applied would have identified as the facts to be assumed in making the legal determination. That, after all, must be taken as the process that guided the district court in identifying those predicate facts. But "likely" presumes the possibility of error in that ultimate assumption, and error that must be tolerated in order to confine interlocutory review within its "purely legal" bounds. The best evidence, after all, of what a district court has "likely assumed" as its predicate facts is not what the court of appeals believes it should have assumed, but the district court's legal determination that on the facts it <u>did</u> assume (rightly or wrongly) a violation was shown.

Seeking on that basis what facts the district court here "likely assumed," as opposed to what it should have assumed on the summary judgment record, the answer seems plain to me. And, plainly to support the court's determination that on those assumed facts, a violation was shown. My analysis would run as follows:

46

The district court's specific statement of the predicate facts it assumed is meager: "it appears from the factual allegations that prison inmates are allowed liberal access to alcoholic beverages and dangerous weapons"; corrections officers therefore were "bound to know that the safety of other inmates was at risk." J.A. 81-82. Elsewhere, however, as directly indicative of its reasoning, the court referred to record materials that could show a number of material facts: that just before the incident at issue, certain of the appellant-officers were aware that Winfield and his eventual attacker, Gibson, had been drinking wine with other inmates in Gibson's cell; that the plaintiff and Gibson got into a fight but then went into their respective cells; that the appellant-officers "could have locked the inmates in their cells but failed to do so"; that "[s]hortly thereafter, Gibson apparently ran out of his cell and struck [appellant] Williams with his homemade shank" before entering Winfield's cell and stabbing him; that a third inmate, Scott, intervened in the fight and subdued Gibson while "certain [appellants] watched Scott intercede but did nothing to assist him"; and that the [appellants] assert that [appellant] Walker immediately signaled for help, but that the assault was over by the time other officers arrived on the scene." J.A. 78-79.

Looking beyond these materials specifically identified by the court, other portions of the record flesh out the court's apparent factual assessment of the situation revealed. Winfield's affidavit asserted that an officer Choice saw his original fight with Gibson but did nothing until several other officers converged on the scene. J.A. 66-67. These officers or at least some of them could be found to have known that the inmates had been drinking, J.A. 69, and, according to the district court, that they had easy access to weapons, J.A. 82. Following their fight in the presence of some of the appellants, Gibson and Winfield went to their cells, but the guards failed to take the obvious step that would have put an end to any immediate danger; that is, close and lock the cells. See J.A. 78 (District Court Op.). Even after Winfield, by his own account, had several times pressed the buzzer that indicated that he wanted his door closed and locked, the guards did nothing and the door remained open. J.A. 67. Meanwhile, according to Winfield, "Gibson was mouthing off to the officers as he went to his cell making threats that he was going to `squash this now', referring to me." J.A. 67. Some indeterminate but brief time after Gibson went into his cell, he retrieved a shank and then reemerged from his cell.

Gibson then entered Winfield's cell and began to stab him as two officers stood and watched. J.A. 68. At a later grievance meeting, Williams stated that the reason he did not intervene was that a Lt. Hicks had ordered the officers not to go into the cells. J.A. 68. Neither the timing of nor the reason for that order, if it was given, appear in the record. As two officers watched the stabbing in progress, a third inmate, one John Scott, pushed through the two officers at the door to the cell and did intervene. Neither officer came to Scott's aid, however. J.A. 68. According to this inmate, the officers continued to stand by doing nothing even after Scott had gotten Gibson's weapon hand under control. J.A. 57. During this struggle with Gibson, according to Scott, Scott asked for help from the guards, several of whom were standing at the door "with enough man-power to take control" if they had only been willing to respond to Scott's request for help. But the guards were not willing to act. J.A. 57.

Of course, the appellants' summary judgment motion and supporting materials present an alternative factual scenario in which they are completely blameless, certainly not deliberately indifferent to Winfield's plight. The majority, accepting critical aspects of their account as "undisputed" by any properly countering materials from Winfield as non-movant, finds error in the district court's legal determination.**9**

But, as indicated, it is plain from the record that the facts as asserted in the appellants' motion papers were not those "likely assumed" by the district court. Instead, it is obvious that that court assumed--and plausibly in this case assumed (though that is not

_____

**9** Incidentally, it bears noting that even if the court were properly conducting a straight <u>de novo</u> review, it would not be justified in accepting certain of the critical facts it relied on as "undisputed" because Winfield as non-movant did not counter them head-on. Where, as was the case here, a movant's forecast of critical evidence is undisputed for the obvious reason that it was in exclusive control of the movants (<u>e.g.</u> that no guard knew that Gibson had a shank; that the guards followed proscribed procedures when Gibson emerged from his cell), the nonmoving party cannot be considered under obligation to deploy specific facts challenging the credibility of the movant's assertions. <u>See</u> 10A Wright, Miller & Kane, <u>Fed. Prac. & Proc.: Civil</u> § 2726 at 120-21, § 2727 at 137-43 (1983). At the time these facts were said to have occurred, Winfield was in his cell with no means of disputing them directly.

48

critical)--a quite different scenario adequately inferable from Winfield's pleading and supporting materials. Under that "likely assumed" scenario, prison guards who were aware that inmates in the Winfield/Gibson cell-block area had access to alcoholic beverages and that some possessed dangerous weapons, did nothing to put a stop to conduct that they were bound to know posed a general risk of violence and harm to all inmates. Having witnessed a fight between Gibson and Winfield that occurred in that general atmosphere, some of the appellant-guards deliberately chose not to lock the two in their respective cells, either on their own initiative or in response to Winfield's request for protection by sounding his alarm buzzer. When Gibson then rushed out of his cell towards and into Winfield's where he stabbed him repeatedly with a metal shank, none of the appellants made any effort to intervene, though an opportunity was clearly presented to attempt prevention or interruption of the stabbing without risk of any greater harm than is a normal incident to the official responsibilities of the position occupied. In all this, the appellant-guards involved, though aware of a serious risk that one prisoner would harm another, adopted a stance of deliberate indifference to that risk, choosing instead to leave the matter to be resolved by the inmates rather than risk any harm to themselves.

If those "likely assumed" facts were established in proof--as they might or might not be--the conduct involved would constitute violation of a clearly established right of which reasonable officials in these appellants' positions would be aware. See Farmer v. Brennan, 114 S. Ct. 1970, 1976 (1994) (recognizing right as established in earlier cases).

If this issue were properly before us, the district court's denial of summary judgment on the basis of these assumed facts should, therefore, be affirmed.

III

Seeking to clarify that which, under collateral order doctrine, is reviewable by appeal from interlocutory orders denying summary judgment on qualified immunity grounds, the Supreme Court in Johnson v. Jones recognized that making the distinction between "fact-related" and "purely legal" determinations that the doctrine

49

required sometimes would pose conceptual and practical problems for courts of appeals. Two of those problems (assuming the related issue is before us for review) are presented in this appeal to a court for which they are new issues under <u>Johnson</u>'s new (for this court) appellate review regime. One is the problem of identifying the predicate facts "likely assumed" by a district court in making its purely legal determination that on those facts a violation of clearly-established constitutional right has been shown when those facts have not been expressly stated by the court. The other is the nature and scope of review of that purely legal determination when it has properly been appealed. In my view, the majority here has failed properly to apply <u>Johnson</u>'s teaching to either of these.

The first, fortunately, is not likely to recur too frequently. If this case teaches anything, it is the special need for express statements by district courts of the predicate facts they have assumed in ruling that on those facts a violation of clearly-established constitutional right has been shown. That lesson absorbed should spare us from more cumbersome searches for facts "likely assumed."

The other problem--what it means when reviewing a district court's purely legal determination to "take as given" the predicate facts assumed by that court as the basis for its determination--will persist. On that problem, the majority has now spoken but, with all respect, wrongly in my view and with unfortunate consequences-- both for the courts and for § 1983 claimants, the deserving among them as well as the undeserving.

Judges Hall, Murnaghan, Ervin, and Michael authorize me to say that they join in this opinion.

50